UNITED STATES of America

v.

ASHLAND–WARREN, INC., Defendant.

UNITED STATES of America

v.

ASHLAND–WARREN, INC., and Sam Wall, Defendants.

UNITED STATES of America

v.

ASHLAND OIL, INC., Defendant.

UNITED STATES of America

v.

ASHLAND–WARREN, INC., Defendant.

UNITED STATES of America

v.

ASHLAND–WARREN, INC., Defendant.

Nos. 81–30033, 81–30037, 81–30038, 81–30042 and 81–30043.

United States District Court,
M. D. Tennessee,
Nashville Division.

March 16, 1982.

See also, D.C., 537 F.Supp. 427.

**434**

Joe B. Brown, U. S. Atty., Nashville, Tenn., John Burley, U. S. Dept. of Justice, Chicago, Ill., for plaintiff.

E. E. Edwards, Nashville, Tenn., John R. Fornaciari, Ray S. Bolze, Washington, D. C., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

This Memorandum addresses the motion of defendants Ashland-Warren and Ashland Oil to dismiss these indictments on double jeopardy grounds, or in the alternative, to require an election of counts. Each indictment alleges a violation of section one of the Sherman Act, 15 U.S.C. § 1.[1] Defendants argue that Ashland-Warren's prior convictions in the Eastern District of Virginia on three section one charges bar these prosecutions, because they are all based on a single conspiracy. For the reasons set forth in this Memorandum, the Court denies the motion. The government may proceed to trial on whichever indictment it elects against defendant Ashland-Warren, and it may proceed as scheduled against defendant Ashland Oil in Case No. 81-30038. After the initial Ashland-Warren trial, however, the government will be required to show cause why the remaining three indictments against Ashland-Warren should not be dismissed on due process grounds, or alternatively, why the Court should not exercise its supervisory powers to dismiss the remaining three indictments.

The Court should make reference to its Memorandum and Order of February 26, 1982, which held that defendant Ashland Oil (Case No. 81-30038) has no standing to raise a double jeopardy defense. Simply stated, this finding was based on the fact that the corporate entity of Ashland Oil was not prosecuted in any of the three Virginia cases that give rise to this double jeopardy claim. The Court refers throughout this Memorandum to "defendants," however, because the same double jeopardy analysis would apply to defendant Ashland Oil, if it had standing. The case of Ashland Oil has been set for trial on June 21, 1982.

### PROCEDURAL BACKGROUND

The grand jury returned all five indictments in February 1981. Defendants' double jeopardy motion and its accompanying brief were filed on April 10, 1981. Extensive discovery followed, consisting primarily of the disclosure of numerous grand jury transcripts that defendants alleged were essential to their motion. Defendants also enjoyed access to the government's documentary evidence presented to the special grand jury empaneled to investigate bidrigging in the Tennessee highway construction industry. The government's response was filed on July 16, 1981, and defendants filed a supplemental memorandum in support the following day. Further discovery of grand jury transcripts followed. During the week of October 26-30, 1981, the Court conducted an evidentiary hearing on defendants' motion. A transcript of the hearing was prepared, and both sides were given thirty days from the completion of the transcript to prepare proposed findings of fact and conclusions of law.

In conducting this evidentiary hearing, the Court was guided by the Sixth Circuit's recent decision in *United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). *Jabara* dealt with a single/multiple conspiracy issue giving rise to a double jeopardy claim in a drug conspiracy prosecution. The Court perceives no reason why *Jabara* would not also be applicable in the context of a Sherman Act prosecution, however. *Jabara*

---

1. In addition, the indictments each allege violations of the mail fraud statute, 18 U.S.C. § 1341, but these counts are not addressed by defendants' motion.

held that a double jeopardy claim requires a pretrial hearing in which the government bears the burden of proving by a preponderance of the evidence that it is not seeking to prosecute the same offense a second time, once the court is confronted with a "*non-frivolous* double jeopardy claim." *Id.* at 576 (emphasis added). The Sixth Circuit did not define what it meant by a non-frivolous double jeopardy claim, but whatever the threshold level is, the burden cannot shift to the government if the defendants' proof alone convinces a court by a preponderance of the evidence that *no double jeopardy violation exists.* This is such a case. Although the government offered proof at the hearing, defendants' proof had failed to shift the burden. *Cf. United States v. McClain*, No. 8–80597 (E.D.Mich. July 2, 1979), *aff'd sub nom. United States v. Jabara, supra.* (The *McClain* opinion is attached as an exhibit to defendants' July 17, 1981, double jeopardy memorandum.)

Defendants failed in this regard even though the Court allowed them unparalleled access to grand jury transcripts that defendants insisted were relevant. *See, e.g.,* Memorandum and Order of July 24, 1981 (granting access to the grand jury testimony of employees of twenty-nine paving companies identified by defendant as co-conspirators). The Court also took steps in cooperation with the United States District Court for the Eastern District of Virginia to provide transcripts from that District for defendants, a measure that required extensive *in camera* inspection of grand jury testimony. *See, e.g.,* Memorandum and Order of October 20, 1981; Memorandum and Order of December 18, 1981. Many of these transcripts failed to meet the standard of particularized need required for their release, *see United States v. Short*, 671 F.2d 178 (6th Cir. 1982), but defendants nonetheless received a substantial number of transcripts from the Eastern District of Virginia. In light of these circumstances, the Court is convinced that defendants en-

joyed equal access to all proof that had any conceivable bearing on their double jeopardy claim. Their failure to come forward with a non-frivolous showing cannot be attributed to inaccessibility of evidence.

## FACTS

### The Virginia Cases

On February 29, 1980, defendant Ashland-Warren, along with two other companies, was indicted by an Eastern District of Virginia grand jury for conspiracy to submit collusive bids to the Capital Region Airport Commission in connection with a job at Byrd Field Airport in Richmond, in violation of section one of the Sherman Act. In a letter agreement dated July 28, 1980, Ashland-Warren agreed to plead guilty to that indictment (Criminal No. 80–000–22–R) as well as to two additional one-count section one felony informations to be filed in the Eastern District of Virginia. Those cases (Criminal Nos. 80–00071–R, 80–00072–R) were filed on August 8, 1980. Case No. 80–00071–R alleges a conspiracy to suppress competition for highway paving projects in the Tidewater area of Virginia.[2] Case No. 80–00072–R alleges a conspiracy to allocate jobs in the Richmond Highway District.[3] This information refers only to jobs for which bid proposals were received on March 6, 1979, by the Virginia Department of Highways. The plea agreement provided that the United States would not prosecute Ashland-Warren or Ashland Oil for any other conspiracies in connection with

> (i) any agreement to restrain trade on paving or construction work bid or let *in Virginia* or (ii) any agreement to restrain trade on any contract bid or let for the sale of any construction materials such as aggregate, asphalt, sand and the like, *within Virginia* or (iii) any agreement to restrain trade on sales of such construction materials *in Virginia* (emphasis added).[4]

2. *See* note 5 *infra.*

3. *See* note 5 *infra.*

4. In its April 20, 1981, motion and brief defendants argued and have consistently maintained that this plea agreement bars prosecution of

**436**

### The Tennessee Cases

For purposes of this Memorandum, the Court may accept the truth of the indictment's allegations, as defendants have done. This dispenses with the necessity of using the customary qualifications, such as "alleged."

Defendants' first indictment in this district, Criminal No. 81–30033, was returned on February 12, 1981. This indictment charges that defendant Ashland-Warren along with three other companies conspired to allocate three highway contracts let by the state of Tennessee on June 29, 1979, and relet by the State on September 21, 1979. The bill of particulars added two more jobs and two more companies.

Case No. 81–30037 charges that Ashland-Warren conspired with unnamed other companies to allocate to itself one highway construction contract let by the state of Tennessee on March 9, 1979. The government subsequently named eight co-conspirators in its voluntary bill of particulars filed May 26, 1981, and identified three more rigged contracts.

Case No. 81–30038 alleges that defendant Ashland Oil conspired to allocate seven highway construction projects let by the state of Tennessee on July 29, 1977. The indictment alleges that Ashland Oil received three contracts as a result of this agreement, and two other highway pavers received two contracts each. The bill names eight additional corporate co-conspirators.

Case No. 81–30042 alleges that defendant Ashland-Warren and another company agreed to allocate between themselves two jobs let by the state of Tennessee on May 18, 1979. The government's voluntary bill of particulars on this indictment further alleges that three other jobs were set up among Ashland-Warren and the other companies named in the indictment, as well as three other companies.

Criminal No. 81–30043 is by far the most complex of the five indictments. The indictment alleges that defendant Ashland-

Warren and Interstate Paving Company agreed to allocate two Tennessee highway construction projects, one of which was let by the state of Tennessee on June 29, 1979, and relet by the State on September 21, 1979. The other contract, the one allocated to Ashland-Warren, was let by the State on May 18, 1979. This indictment is more complex because the job allocated to Ashland-Warren was legitimately awarded to D. R. Allen & Son, Inc., a North Carolina contractor. Ashland-Warren ultimately received the contract by subcontract from D. R. Allen after making a payoff to D. R. Allen for $250,000. This indictment is the only one of the five involving highway construction projects in the eastern part of the state. One of the jobs was in Sullivan County, and the other job extended over Greene and Washington counties. Sullivan County borders Virginia in the extreme northeastern corner of Tennessee. Washington and Greene counties lie directly below Sullivan County.

The indictments, as expanded by the accompanying bills of particulars, allege a total of twenty-three highway construction projects that were allocated among defendant and its co-conspirators [hereinafter sometimes referred to as the "Tennessee jobs"]. The bills of particulars allege that a total of twenty-one different companies, including both defendants, were co-conspirators in setting up the twenty-three contracts. Government Exhibit 73, introduced at the evidentiary hearing, expanded the list of co-conspirators to thirty-one different companies by accepting defendants' contention that the grand jury testimony released to them indicated that at least ten more companies had participated in collusive bidding on these jobs. See Supplemental Memorandum in Support of Motions of Ashland-Warren, Inc. and Ashland Oil, Inc. to Dismiss the Indictments on Double Jeopardy Grounds or to Require an Election of Counts, Exhibits D–H (filed July 17, 1981).

For the purposes of this Memorandum, however, the Court accepts defendants' further contention that every paving company

these five indictments. That contention's re-

jection does not require discussion.

that obtained a plan for an advertised highway project contract was necessarily a party to the scheme if a highway project was "set up." *See* Defendants' Proposed Findings of Fact and Conclusions of Law Regarding Motion to Dismiss Indictments on Double Jeopardy Grounds in Violation of Plea Bargain, or in the Alternative, to Require an Election of Counts, at 6, 11–13 [hereinafter referred to as Defendants' Brief]. By analyzing the bid tabulation lists for the seven different state of Tennessee project lettings over which these twenty-three jobs extended, the Court has determined that a total of fifty-six different companies, including both defendants, obtained proposals for these jobs. *See* Defendants' Exhibits 49–55. The list of fifty-six companies [hereinafter sometimes referred to as the "Tennessee conspirators" or "bidriggers"] is compiled as Appendix A to the Memorandum (attached). Testimony at the evidentiary hearing indicated that this was not in fact the uniform practice. *See* Transcript of Evidentiary Hearing 201, 913 [hereinafter referred to as Transcript]. Nevertheless, the Court is willing to accept defendants' proposition for purposes of analysis. Of course, it must be remembered that defendants' ultimate assertion is that all highway pavers in Virginia and Tennessee were co-conspirators with one another in one huge agreement to allocate highway projects, and thus in defendants' view, the identity of the particular collusive bidders on any single project is essentially irrelevant. The Court realizes that the foregoing discussion requires elaboration of the factual background, which now follows.

### The System of Competitive Bidding in Tennessee and Virginia

The state of Tennessee awards highway construction projects on the basis of competitive bidding, or at least the system is supposed to work in that manner. The State conducts bid "lettings" approximately ten to twelve times a year, at which the State receives competitive bids for pre-advertised highway construction projects. Anywhere from ten to thirty different highway construction projects are open for bids at each monthly letting, which are held in Nashville.

Highway paving companies interested in a particular project could obtain proposals and plans from the Tennessee Department of Transportation. Several days prior to the actual bid letting, the Tennessee Road Builders Association, in conjunction with the Tennessee Department of Transportation, published a list of all the projects to be let, including the identities of all companies that had obtained proposals. The document also contained the State's estimated price. This document was referred to as the "bid tab" or the "bidders list." *See, e.g.,* Defendants' Exhibits 49–55. In other words, prior to the deadline for submitting bids, the identity of each potential competitor on each construction project was known to all other competitors. After the bids were opened, the bid tab was republished with the actual bids submitted by the bidders. It should be noted that only a relatively small proportion of the proposal holders actually submitted bids; of the fifty-six companies that obtained proposals on the twenty-three jobs at issue in these indictments, only nineteen different companies actually submitted bids among the twenty-three jobs. A total of 113 bids were submitted by these nineteen companies. *See* Defendants' Exhibits 49–55.

The Virginia system of awarding construction projects was virtually identical. Virginia conducts bid lettings approximately once a month in Richmond. Virginia also publishes a bid tab that makes public the names of all proposal holders. *See, e.g.,* Defendants' Exhibit 59.

### The System of Bidrigging in the Highway Paving Industry

In the past two years, the Court has become quite familiar with the job allocation system used by companies in the Tennessee highway construction industry. The Court has heard offers of proof in accepting guilty pleas and testimony during sentencings in ten criminal antitrust cases. Moreover, this Court conducted the trial in *Unit-*

ed States v. McKinnon Bridge Co., et al., 514 F.Supp. 546 (M.D.Tenn.1981), which took place in September 1981. The term "highway construction" encompasses three different functions, each of which has its own identifiable industry. These are the functions of grading, bridgework, and paving. This case involves only the paving industry. The basic points of bidrigging did not vary substantially from industry to industry, however, as this Court learned in McKinnon Bridge.

Although it is impossible to say that the system always worked the same, the usual method of job allocation in the paving industry was as follows: After the bid tab for a particular letting was made public, a contractor desirous of allocating work to himself would select the job or jobs he would like to be awarded, if any. The contractor would identify from the tab the other contractors who had taken out or "pulled" proposals, which necessarily supplied him with a list of his potential competitors. Having targeted a particular job or jobs, the contractor would then contact all of those contractors who had pulled proposals on those contracts, and persuade them not to bid. This practice was referred to as "clearing the job," or "working out the job." After a job was worked out, it was generally necessary for the "winner" to supply the dollar figure for the "complementary bids" submitted to exceed. If a contractor was unable to work out a job, he would normally inform all the previously-contacted contractors that the job was "open" to be bid "hard," or bid the "hard way."

Central to the emergence and nurturing of the bidrigging scheme that flourished in the highway paving industry in particular is the limited "haul distance" of hot asphalt. Asphalt should be laid within one hour after being loaded onto a truck. This means that the haul distance from a company's asphalt plant to a job site is about forty miles. One witness even testified that the haul distance was limited to thirty miles. The haul distance placed a definite upper limit on a company's ability to handle a job. Even within that limit, the cost necessarily increased with the distance from plant to job

site, so that as a general rule, the company with the plant closest to a job site had an almost insuperable competitive advantage, assuming a competitive system. Consequently, it became an unwritten rule in non-urban areas that the firm having the plant closest to the job would be awarded that contract. Bidrigging thus served the function of enhancing that company's profits. In urban areas or in other areas where asphalt plants were in close proximity, bidrigging served the function of allocating work in an "equitable" manner among the putative competitors.

It should be noted that asphalt plants, or at least most asphalt plants, can be moved to a job site, if the potential profits warrant. Moving a plant is an expensive operation, however. Defendants' witness Hubert Riddle testified that even a "real mobile" plant would require a cost of $25–30,000 to move. Transcript at 171. Riddle testified that all plants could be moved, although some are much more "capable" than others. Id. at 228. Riddle also testified that some areas are very difficult to move into because it is difficult to receive a "pollution permit." Id. at 228–29. Riddle also testified that the cost of setting up an entirely new plant is about a million dollars. Id. at 171, 228.

Because asphalt plants could be moved, a contractor could be viewed as a competitor on a job even though he did not have a plant within the haul distance. Thus it can be said that anyone on the bidder's list was a potential competitor, despite distance, although this was not invariably the case. It was not uncommon for firms to "pull" proposals for reasons unrelated to possible interest in obtaining the described job. Consequently, a contractor who had taken the lead in setting up a job would sometimes ignore other companies on the bidding list. Transcript at 201–02, 913. This fact is inconsistent with defendants' assertion that holding a proposal definitely established a company as a potential competitor on a job. As previously stated, however, the Court accepts defendants' general proposition that a proposal holder had to be cleared off a job

even when he would not appear to be a serious competitor. Ignoring a proposal holder could be a costly mistake. For example, in Case No. 81–30043 the bill alleges that Ashland-Warren ignored a proposal holder who won the job "the hard way," a situation that ultimately required a $250,-000 payoff from Ashland to that company for the work.

A contractor endeavoring to set up a job would call up the proposal holders to determine whether they had any "interest" in the specific job. A negative response, or a negotiated agreement that the other party would not compete for the job, created an obligation on the part of the caller to return the "favor" either in the same letting or in a subsequent letting. Of course, it was also possible that a contractor setting up a job might call upon favors previously owed to him. One witness referred to this entitlement to future favors as having a "marker out." Transcript at 424. Sometimes it happened that the other proposal holders would not agree to go along, and a job would be bid the hard way.

To a certain extent a practice of dishonor among thieves developed in which contractors would take out proposals on jobs located far from their nearest plant even though they had no interest of any sort in the job. The reason for this "bluff" was to obtain leverage over as many contractors as possible by creating obligations when those contractors asked the proposal holder if he was "interested" in that job at the "clearing" stage. Witness Riddle testified that he had taken out proposals on jobs as far as 100 miles from his nearest plant. Transcript at 157. This testimony suggests an upper limit on the capacity of a distant contractor to be considered a competitor even when he obtained a proposal.

The obligations created by job clearing were often indefinite, although it was not uncommon for companies to trade off specific jobs in the same letting. Sometimes a company would receive complementary bids in its favor almost automatically because it was the closest plant to a job site. This meant that that company was expected to submit complementary bids on jobs in which its putative competitors were closest. Sometimes a group of contractors would have an arrangement in which they had agreed to allocate a certain amount of "tonnage" to each other. Some companies had arrangements whereby work was allocated on "dollar volume." Witness Duckworth summarized this situation well when he testified that "[s]ometimes you traded job for job. Sometimes you traded location for location. Sometimes you would trade tonnage for tonnage, or dollar volume for dollar volume." Transcript at 915. He further testified that sometimes contractors traded for future promises that "might be two years" in coming. *Id.* at 1017. The Court finds that the rigging of a particular construction project was not, as a general rule, a discrete event in time. A rigging often reflected prior dealings and also directly affected the course of future job allocations. On the other hand, it often happened that companies would split up the work in a particular letting, "job for job," leaving a clean slate as between those two contractors. Transcript at 26.

Defendants showed that the same system of bidrigging prevailed in Virginia. A contractor, if successful, would clear off all proposal holders, and then the contractor would supply a figure to bid above. Virginia contractors "honored" and "respected" each other's plant locations, and it was an unwritten rule that the firm that had the closest plant to a job site would be awarded the contract. In urban or congested areas, such as Richmond and the Tidewater region, conspirators would attempt to divide work on a tonnage basis, as was done in Nashville.

There can be no doubt that bidrigging was a way of life in the highway construction industries in Tennessee and Virginia. The Court is quite willing even to accept defendants' repeated assertions that the practice was prevalent throughout the entire southeast, although the entire southeast is not relevant to the focus of this inquiry. The Court cannot imagine that any contractor was unaware of the prevail-

ing practice. The system was so widespread that contractors who were previous strangers to one another could set up a job together as if it were the most mundane of business transactions. Bidrigging as described above was an accepted way of doing business in the fullest sense of the word, despite its patent illegality. It should be noted, however, that the practice was not exclusive; many jobs were bid the hard way, and during some periods of time the working out of jobs was virtually nonexistent. *See* Transcript at 927.

### Facts Particularly Significant To the Single/Multiple Conspiracy Issue

Government Exhibit 73, which was received without objection at the evidentiary hearing, lists fifteen companies, including Ashland-Warren, as co-conspirators in the three Virginia cases for which defendant stands convicted [hereinafter sometimes referred to as the "Virginia conspirators" or "bidriggers"]. The Court accepts defendants' contention that all fifty-six companies holding proposals on the Tennessee jobs in these five indictments participated in setting up those jobs. Out of those fifty-six companies, however, only defendant Ashland-Warren overlaps the list of fifteen Virginia conspirators.

Defendant offered no proof that any of the Tennessee conspirators (except Ashland) had asphalt plants within hauling distance of the areas referred to in the two Eastern Virginia informations and the single indictment.[5] Defendant offered no

proof that any of the Tennessee conspirators except for Ashland had ever even pulled proposals on jobs in the Richmond or Tidewater areas, but the Court independently discovered that Pendleton Construction, a Virginia-based company named as a co-conspirator in Case No. 81–30043, had obtained a proposal for the March 6, 1979, letting for Richmond District jobs. *See* Defendants' Exhibit 165, at 10. This was the letting upon which defendant's second information was based. The failure of the Tennessee conspirators to pull proposals on the Eastern Virginia jobs is important, because that would have been the signal that a company was contemplating the possibility of moving a plant. Defendants' Exhibit 30 shows that Pendleton, which along with Pope Paving Company was one of the two Virginia-based companies among the Tennessee conspirators, made bids on work extending into central Virginia, but not into Eastern Virginia. Pope Paving's operations were limited to a fifteen mile radius of Bristol, Virginia, which is in the extreme southwestern corner of Virginia, bordering Tennessee.

Defendants' own proof shows that the fifty-six proposal holders on these Tennessee jobs, only nine (not including Ashland-Warren) had ever submitted a bid anywhere in Virginia, much less in the eastern part of the state. *See* Defendants' Exhibits 45, 47. This compilation extended back as far as 1975. *See* Transcript at 1059. Of the twenty-nine co-conspirators listed by

---

5. The indictment alleges that defendant Ashland-Warren set up a job at Byrd Field in Richmond. The first information alleges that defendant allocated work in the Tidewater area of Virginia, described by the boundaries of Norfolk, Virginia Beach, Portsmouth, Chesapeake, Suffolk, Hampton, and Newport News. The latter information alleges that Ashland-Warren allocated work in the Richmond District of the Virginia Department of Highways. This information is limited in time to a letting held on March 6, 1979. The indictment in *United States v. Blakemore Construction Corp., et al.*, Crim. No. 81–00067–R (E.D.Va. July 16, 1981), which charges other defendants with the same conspiracy, refers to the "Richmond area," which encompasses the area in and around the city of Richmond, including but not limited to

the counties of Charles City, Chesterfield, Goochland, Hanover, Henrico, Louisa, New Kent, and Powhatan. Government Exhibit 25. Pursuant to Rule 201(b)(2), the Court takes judicial notice that the Richmond Highway District also included the counties of Prince George, Amelia, Nottoway, Dinwiddie, Lunenburg, Brunswick, and Mecklenburg. This is shown by a map of Virginia's construction district locations in Defendants' Exhibit 228, pp. 52–53. Exhibit 228, a publication of the Virginia Asphalt Association, was marked for identification but not offered into evidence. The Court finds that this map is a source whose accuracy cannot reasonably be questioned. Defendants' Exhibit 30 is based on a map of Virginia, and shows that these counties lie in the southeastern quadrant of the state.

the government along with the Ashland defendants in Government Exhibit 73, thirteen were at least qualified to bid in Virginia since 1976. *See* Government Exhibit 33. Of the fifteen Eastern Virginia co-conspirators listed in Government Exhibit 73, only Ashland-Warren and Rea Construction Co. were eligible to bid in Tennessee after 1976. There was no evidence of any dealings between the fifty-six proposal holders in Tennessee and the fifteen Virginia co-conspirators on any projects in Virginia or Tennessee (ignoring the overlap of Ashland-Warren).

## DISCUSSION

Section one of the Sherman Act, 15 U.S.C. § 1, imposes criminal sanctions on every contract, combination, or conspiracy in restraint of trade. Any potential distinctions among the terms "contract, combination, or conspiracy" are immaterial to defendants' double jeopardy claim, which is premised on the undisputed point that the prosecutions at issue are based on a conspiracy theory. *See generally* Wirtz, *Sherman Act Conspiracies*, 57 Wash.L.Rev. 1, 40 (1981) (stating that there are no clear distinctions between these terms, although the Supreme Court has implied that distinctions do exist) [hereinafter cited as Wirtz].

The essence of defendants' argument is that the paving jobs they set up in the Eastern District of Virginia and the jobs they set up in Tennessee were part of a single, continuous section one conspiracy that extended through the two states.[6] Defendants maintain that this giant agreement, which included virtually all Virginia and Tennessee highway paving companies, was conceived at some unknown time in the past and continued until the government's large-scale prosecution of bidrigging in the highway construction industry exposed it.

Defendants claim that because they have already been convicted three times in Virginia for their role in this same conspiracy,[7] the double jeopardy bar should foreclose these renewed prosecutions.[8] *See United States v. H. E. Koontz Creamery, Inc.*, 257 F.Supp. 295 (D.Md.1966).

According to defendants, the government has erred in these indictments by treating their bidrigging activity "as a cinematographic series of distinct conspiracies, rather than to call it a single one." *United States v. Kissel*, 218 U.S. 601, 607, 31 S.Ct. 124, 125, 54 L.Ed. 1168 (1910) (Holmes, J.). They insist that when the facts are examined as a whole, it becomes obvious that the conspiracies charged in these indictments are simply separate parts of the larger grand conspiracy for which defendants already stand convicted. *Cf. Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (observing that the character and effect of a conspiracy are not to be judged by dismembering it and viewing the separate parts, but by looking at it as a whole).

### No Single Section One Conspiracy as a Matter of Law

The gist of the crime of conspiracy to violate section one of the Sherman Act is an agreement that restrains trade. *See United States v. United States Gypsum Co.*, 600 F.2d 414, 417 (3d Cir.) *cert. denied*, 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); Wirtz, *supra*, 57 Wash.L.Rev. at 42–44. This focus on the existence of an agreement is identical under traditional conspiracy analysis, which also views agreement as the gist of the crime. *See* W. LaFave & A. Scott, *Criminal Law* § 61, at 460 (1972) [hereinafter cited as LaFave & Scott]; Note, *Resolution of the Multiple Conspira-*

---

6. Defendants in the early stages of this litigation repeatedly insisted that the conspiracy covered the entire southeast. Because they were required only to show a conspiracy covering Virginia and Tennessee, the Court excluded attempts to prove a conspiracy extending into other southeastern states.

7. It would appear that the double jeopardy defense did not occur to defendants' counsel soon enough to be raised in the Virginia prosecutions.

8. There is no dispute that the protection of the double jeopardy clause applies to corporate defendants. *See United States v. Hospital Monteflores, Inc.*, 575 F.2d 332 (1st Cir. 1978).

*cies Issue via a "Nature of the Enterprise" Analysis: The Resurrection of Agreement,* 42 Brooklyn L.Rev. 243, 307 (1975).

In deciding whether defendants have shown a single conspiracy within the meaning of section one, the Court must act in light of the statutory purpose of the Act. *See Rose v. Lundy,* —— U.S. ——, ——, 102 S.Ct. 1198, 1200, 71 L.Ed.2d 379 (1982). The Sherman Act's purpose is to preserve competition. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 4–5, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958); *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933). Defendants argue a construction of the word "conspiracy" that ignores this purpose. The Court therefore holds that as a matter of law, defendants' argument must be rejected.

Simply stated, the issue is whether the same anti-competitive agreement encompassed the jobs defendants set up in the Eastern District of Virginia and for which they were convicted, as well as the bidrigging activities in Tennessee charged in these indictments.[9] Defendants necessarily take a breathtakingly expansive view of the word agreement, a view so broad that Virginia companies bidding on Eastern Virginia jobs are seen as parties to an agreement with predominantly Tennessee-based paving companies setting up bids on Tennessee jobs, even though the respective companies are not, in any meaningful sense, competitors with one another. Defendants' position can best be summarized as asserting that an industry-wide "understanding," Brief at 82, or a pervasive "industry-wide system" of bidrigging, Brief at 80, constitutes a single agreement for which a defendant may only be prosecuted once. The government, on the other hand, has not attempted to articulate any view on the nature of a section one agreement amounting to an unlawful conspiracy; it has simply maintained that the indictments at issue charge separate agreements warranting separate prosecutions.

The concept of "agreement" is elusive. *See* Crane, *Confronting Antitrust Doctrine with the Law of Criminal Conspiracy: A Time for a Re-evaluation and Change,* 47 Antitrust L.J. 635, 640 (1978) [hereinafter cited as Crane]. Indeed, the elusive concept of agreement accounts for the disturbingly nebulous quality of modern conspiracy law, which defendants have, ironically, turned against the government in this case. Defendants correctly point out that no formal, express agreement is required. *See American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946). It is also true that persons may be convicted for the same conspiratorial agreement even though they do not know each other, and are only generally aware of the "larger common plan." *Blumenthal v. United States,* 332 U.S. 539, 557–58, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). The Supreme Court has even declared that, in the antitrust context, a tacit understanding created by a long course of conduct may constitute an unlawful agreement without any personal communications among the parties. *Direct Sales Co. v. United States,* 319 U.S. 703, 714, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943). These principles have contributed to a significant erosion of the traditional understanding of what an "agreement" is, but they have not eliminated the agreement element as the key to section one liability. *See United States v. United States Gypsum Co., supra,* 600 F.2d at 717; E. Devitt & C. Blackmar, Federal Jury Practice and Instructions §§ 55.07, 27.04 (1977). A section one criminal conviction still requires some form of concerted action among the parties. *See Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 223, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939); L. Sullivan, Antitrust § 109, at 312 (1977).

Although an *express* agreement is unnecessary, the "understanding" requires reciprocal benefits and burdens to its participants before they may be found to have

---

9. At this point there is no need to distinguish among the five Tennessee cases. Defendants argue that each prosecution is barred for the same reason, and thus at this point the five indictments are better viewed conceptually as one. Whether the five indictments actually allege but one conspiracy among themselves is discussed *infra,* at 447 448.

engaged in an unlawful agreement. As observed in a case frequently cited by defendants, the essence of a Sherman conspiracy lies in its reciprocal nature. *United States v. David E. Thompson, Inc.*, 621 F.2d 1147, 1149 (1st Cir. 1980).

In the context of a horizontal price-fixing conspiracy conducted through bidrigging, it is difficult to imagine how reciprocity can exist unless the parties to the scheme would, in the absence of price-fixing, be competitors with one another. Indeed, a horizontal price-fixing conspiracy cannot realistically bear the name unless made among entities that should be competing, for otherwise it has no reason for coming into existence.

Defendants have never contended that the respective sets of companies [10] engaged or could have engaged in competition with another. Defendants did not show that any of the Eastern Virginia conspirators, aside from itself, was in a position to compete for the jobs named in these indictments. In fact, the government showed that only two of the Eastern Virginia companies, including defendant, were even eligible to bid in Tennessee at all. Conversely, there was no proof that any of the alleged conspirators in these cases, again excluding defendants, had the means to handle jobs in Eastern Virginia. The reason has nothing to do with the "magic" of state lines; defendants have been amply persuasive in showing that a Tennessee company can set up jobs in Virginia, and vice versa. The reason for the "non-competition" of the two groups of conspirators is even more fundamental, however, in that it is simply a function of the fact that a company cannot compete for a job unless it has a plant within forty miles of the job site. Because none of the co-conspirators in these cases (except defendant Ashland-Warren) own plants in Eastern Virginia, they were necessarily excluded from competition. The Eastern Virginia conspirators were excluded from this district for the same physical reason, not because of any agreements with the pavers in Tennessee.

Defendant attempted to address this basic flaw in its theory by offering proof that asphalt plants are portable, thus making every highway paver a potential competitor everywhere, as evidenced by the fact that companies often took out proposals on distant jobs. The Court was convincingly shown that asphalt plants can be moved, but the Court was equally impressed by the prohibitive magnitude of such an operation. The testimony showed that the cost of moving a plant is at least $30,000. Obviously, the potential profit on a job would have to be considerable to make a move worthwhile. Moreover, none of the Tennessee co-conspirators, except for Ashland, took out proposals on jobs for which defendant was convicted in Virginia, with one exception that the Court could ascertain.[11] Pulling a proposal would have been prerequisite to even threatening a move. Accordingly, the Court has no hesitation in finding that the possibility of moving plants did not transform these two discrete groups of highway pavers into potential competitors. They could not conspire with one another because their physical limitations made it impracticable for them to compete with each other, and no competition was even threatened by the pulling of proposals.

Defendants successfully proved that bidriggers in Virginia shared with Tennessee bidriggers a way of doing business with the common purpose of allocating work, thereby enhancing profits for all. There can be no dispute on these points. But a common purpose does not make a conspiracy. Persons can share an unlawful objective without being parties to an agreement, and that is precisely all that defendants have proven in this proceeding. *See* LaFave & Scott, *supra*, § 61, at 464. Bidrig-

10. The fifteen Virginia co-conspirators listed in Government Exhibit 73 and the fifty-six companies listed in Appendix A.

11. Defendants' Exhibit 219, p. 10, shows that Pendleton, a co-conspirator in Case No. 81–

30043, pulled a proposal for the March 6, 1979, Richmond letting, which is the focus of the second Eastern Virginia information to which defendant pleaded guilty.

ging worked identically in Eastern Virginia and in this district, but section one liability for a horizontal price-fixing conspiracy conducted through bidrigging can arise only among potential competitors in the same market. With no jobs to allocate among themselves there was nothing to agree about, and thus the members of the respective groups were incapable of a conspiracy to restrain trade. The Virginia convictions necessarily attach to an agreement or agreements distinct from those alleged in this district. Consequently, the Court finds that defendants have not been put in prior jeopardy for the bidrigging agreements charged in these indictments.

■ The cases defendants rely upon illustrate the point that the threshold requirement for criminal liability in a bidrigging conspiracy is an agreement among competitors. For example, in *United States v. Consolidated Packaging Corp.*, 575 F.2d 117 (7th Cir. 1978), the government charged twenty-three folding carton companies in a single, one count, section one indictment alleging a nationwide price-fixing conspiracy in the industry. Consolidated was the only company to go to trial (all others having pleaded nolo contendere), and it was convicted. On appeal Consolidated raised a variance issue by arguing that it was not a member of the charged national conspiracy, but, at worst, was merely engaged in isolated acts that should have been separately charged. *See Kotteakos v. United States*, 328 U.S. 750, 90 L.Ed. 1557, 66 S.Ct. 1239 (1946). The Seventh Circuit rejected the argument, holding that the proof sufficiently established a national conspiracy with Consolidated as a member. 575 F.2d at 126–28. In context of this case, however, the important point about *Consolidated Packaging* is that the nationwide, industrywide conspiracy joined in by Consolidated was limited to companies that competed with each other in the national folding carton market; as the Seventh Circuit stated, Consolidated was "engaged in a conspiracy with those who should have been Consolidated's competitors." *Id.* at 125. It was true that many of the conspirators did not know each other and were not always interested in the same

customers, but they were nonetheless all working in the national market place for customers located in various parts of the country. *See id.* Unlike this case, in *Consolidated Packaging* the defendant and its co-conspirators would have been competing in the national market, but for the nationwide price-fixing agreement. In this case, by contrast, the highway pavers involved in these indictments would not have been competing with their Eastern Virginia counterparts regardless of the pervasive, industry-wide practice of bidrigging. Ignoring all other distinctions between *Consolidated Packaging* and the instant case, the fundamental distinction is that *Consolidated Packaging* involved price-fixing among competitors.

The same is true of *United States v. David E. Thompson, Inc.*, 621 F.2d 1147 (1st Cir. 1980), another case in which the government urged a single conspiracy finding in response to a variance argument. Like *Consolidated Packaging*, that case was brought against "putative competitors" in the New England architectural hardware business. *See id.* at 1148–49. The conspiracy among the Boston area suppliers was to allocate projects "among themselves," instead of competing for the New England business. *See id.* at 1149.

*United States v. H. E. Koontz Creamery, Inc.*, 257 F.Supp. 295 (D.Md.1966), might be called the "grandfather" of defendants' theory in this case, because it is apparently the oldest case in which a court dismissed a section one prosecution on double jeopardy grounds. The defendants were putative competitors in the Baltimore area milk business who, essentially, entered into one big agreement to maintain non-competitive milk prices in the Baltimore area. *Id.* at 310. Consequently, the district court rejected the government's attempt to charge multiple conspiracies. *Id.* at 311. But once again, the facts completely distinguish the instant case.

*United States v. American Honda Motor Co.*, 273 F.Supp. 810 (N.D.Ill.1967), was a section one prosecution for a vertical price

maintenance scheme between American Honda and its local dealers. The court found that Honda was engaged in one national conspiracy with all of its dealers, and therefore dismissed the government's effort to break it up into smaller, local conspiracies. The case is instructive, but has nothing to do with the question of multiple bidrigging conspiracies. The case actually undercuts defendants' position significantly. Judge Will rejected Honda's argument that section one applies to "courses of conduct," which is essentially defendants' argument in this case. Id. at 814.

United States v. Rodgers, 624 F.2d 1303 (5th Cir. 1980), cert. denied sub nom. Anthony J. Bertucci Construction Co. v. United States, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), contrary to defendants' representations, did not even address Sherman Act prosecutions, which had been severed from the trial at issue. The defendants challenged their multiple mail fraud convictions on variance grounds, arguing that the proof indicated multiple, isolated schemes to defraud and not the single scheme charged in the indictment. Id. at 1307. The Fifth Circuit was satisfied that the jury could have found one scheme. The case has no relevance to the issue at hand, because Rodgers involved a continuing scheme by a group of competitors who met with one another face to face at intervals to set up construction projects awarded by the Corp of Engineers along the Mississippi River. The case is significant authority against defendants in one respect because Judge Frank Johnson found that even on those facts, the jury could have found several schemes, a finding which would be analogous to a finding of multiple conspiracies in this case.

These cases reinforce the Court's conclusion that a conspiracy to restrain trade through bidrigging requires putative competitors. Of course, it is possible in some contexts for non-competitors to engage in unlawful price-fixing; perhaps the most obvious example is vertical price maintenance. E.g., United States v. American Honda Motor Co., supra. Even among competitors, a violation of the Act may occur though the

conspirators lack the actual means to achieve price-fixing. See United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 224 n.59, 60 S.Ct. 811, 844 n.59, 84 L.Ed. 1129 (1940). But in all contexts, the basic policy of the Sherman Act must be remembered. The Sherman Act's fundamental purpose is to preserve competition. Moreover, the protection of price competition is an object of the Act's "special solicitude." United States v. General Motors Corp., 384 U.S. 127, 148, 86 S.Ct. 1321, 1332, 16 L.Ed.2d 415 (1966). But price-fixing by means of bidrigging is flatly impossible when the alleged conspirators are not also competitors. Price-fixing is banned because of its actual or potential threat to the "central nervous system of the economy." United States v. Socony-Vacuum Oil Co., Inc., supra, 310 U.S. at 224 n.59, 60 S.Ct. at 844 n.59. Bidrigging poses such a threat only when its participants would otherwise be competitors. Unless the offending group consists of competitors, a bidrigging scheme lacks any utility. Cf. id. at 224 n.59, 60 S.Ct. at 844 n.59 (price-fixing agreement may have utility even when the group cannot control market prices). Because Ashland conspired with an entirely different group of competitors in Eastern Virginia, those convictions were for different offenses from these. Consequently, the Virginia convictions are no bar to these indictments.

*No Single Conspiracy as a Matter of Fact*

■ The Court has attempted to address the single/multiple conspiracy issue by reference to antitrust law, holding that noncompetitors cannot be part of the same agreement to fix prices by bidrigging on highway construction projects let by state sovereigns. But, even if the antitrust context of this case is completely ignored, the Court is also satisfied that, as a matter of fact, there was no single agreement encompassing both sets of conspirators that can reasonably be described as one conspiracy. The Sixth Circuit has recently adopted a "totality of the circumstances" test for deciding a single/multiple conspiracy issue in the context of a double jeopardy challenge.

See *United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). A student commentator has suggested and analyzed several elements of a totality of the circumstances test in a law review Note obviously inspired by the Eighth Circuit's opinion in *United States v. Tercero*, 580 F.2d 312 (1980), which the Sixth Circuit followed in *Jabara*. *See* Note, *"Single vs. Multiple" Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes*, 65 Minn.L.Rev. 295 (1980). This commentator suggests consideration of the following factors: (1) Overlap in overt acts; (2) overlap in personnel; (3) time sequence of overt acts; (4) methods of operations; (5) location of overt acts; (6) conspiratorial objectives; and (7) degree of interdependence.

The element referred to as "overlap in overt acts" is the vestige of the discarded "same evidence" test, under which a court merely examined the indictments at issue to see whether the proof required to support a conviction on one was the same required to support a conviction on the second. *See* Note, *supra*, 65 Minn.L.Rev. at 304–06. If so, a single conspiracy was found. In the instant case, there is no overlap in the proof required to convict on the indictments under review. This is, however, the least significant of the seven factors, since it is so easy to draft separate indictments with no overlap in the proof required. The "same evidence" test is useful as a threshold criterion, *see Wilkett v. United States*, 655 F.2d 1007 (10th Cir. 1981), and these indictments pass that minimal level of scrutiny.

When examined in gross, without regard to specific jobs or companies, three factors weigh in defendants' favor. The time sequence between the Eastern Virginia indictments and informations is not significantly different from the time sequences alleged in these indictments. Second, the methods of operations in both districts were generally the same in regard to the way jobs were cleared. Third, the conspiratorial objective of allocating highway construction jobs was identical, although entirely different jobs were involved.

The "location of overt acts" clearly weighs in favor of the government, given the obvious geographical separation of the two regions. In itself, this is not an important factor, given the nature of defendants' theory. Distance becomes extremely significant in examining the "interdependence" element, however, because the limited haul distance contributes enormously to the lack of reciprocity that is essential to a single conspiracy finding.

The most important element, according to the commentator, is, overlap in personnel. *See* Note, *supra*, 65 Minn.L.Rev. at 313–14. This element points unambiguously in the government's favor. Of the thirty-one co-conspirators named in the five Tennessee cases and the fifteen in the Virginia cases, *see* Government Exhibit 73, only Ashland-Warren overlaps. This remains true even when the twenty-five additional companies obtaining proposals in these cases are considered. *Compare* Appendix A *with* Exhibit 73.

Finally, and in this Court's view, most significantly, defendants failed to show any meaningful interdependence between the separately-charged conspiracies in the two districts. The Court considers the "interdependence" factor synonymous with the common law view that a single conspiracy exists if its participants are aware of each other's participation in a general way and have a *community of interest*. LaFave & Scott, *supra*, § 62, at 470 (emphasis added). Defendants adduced no proof of a genuine community of interest between the two sets of conspirators, even though the Court had apprised them that a showing of interdependence was crucial.

Defendants presented some testimony suggesting that if competitive bidding had erupted in one region, it would have "spread like fire" to another, but that is a far cry from showing that the conspirators in the two regions were mutually dependent on one another to achieve a common goal through a single, comprehensive plan. *Cf. Blumenthal v. United States, supra*, 332 U.S. 539, 553 n.14, 68 S.Ct. at 254 n.14 (finding a common enterprise to distribute liquor). Nothing in the record suggests that the Eastern Virginia conspirators ben-

efited from the activities of their Tennessee brethren; nothing suggests that the effectiveness of the Tennessee system depended upon the activities of bidriggers in Virginia. This finding points to the absence of a single conspiracy. *Cf. United States v. Anderson*, 101 F.2d 325 (7th Cir.) *cert. denied*, 307 U.S. 625, 59 S.Ct. 822, 83 L.Ed. 1502 (1939), *cited in* LaFave & Scott, *supra*, § 62, at 482 (one conspiracy found when effectiveness of the conspiracy depended on its activities at three locations).[12] Indeed, in this Court's view it is dispositive. Alternatively stated, the Virginia agreements entered into by those companies required no sort of combined operation with the Tennessee companies, much less a continuous operation that characterizes a single conspiracy. *See United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973).

Having applied a totality of the circumstances test, the Court finds that, as a factual matter, the Eastern Virginia convictions were based on separate conspiracies. The proof showed that separate businesses (excluding defendant Ashland-Warren) engaged in separate, independent agreements to rig jobs in two widely-separated areas. Consequently, at least one of the four indictments against Ashland-Warren may be tried without placing defendant twice in jeopardy.

### Single/Multiple Conspiracy Issue Within These Indictments

Because no jeopardy will attach in these cases until the first one goes to trial, the issue of whether the four indictments address separate conspiracies inter se is not technically ripe. The Court has, however, necessarily given considerable thought to the basic question of what is a separate "agreement" in these cases, and there is no reason not to disclose the Court's views as to the single/multiple conspiracy issue within these indictments, particularly since the evidentiary record on the issue is complete.

The fundamental flaw in defendants' theory that a widespread system of doing business amounts to a single conspiracy is that it ignores the heart of the conspiracy offense, which is an agreement. Under the defendants' theory, the definition of agreement is pushed to a point where it lacks any meaningful content; businessmen partake of a single agreement with one another if they share a common devotion to the practice of bidrigging, no matter how independently they practice it. In a sense we can say that all restaurants "agree" to sell food to the public, or, more pertinently, that all highway pavers "agree" to pave roads. If bidrigging had never occurred, we could say that all highway pavers were in an "agreement" to allocate jobs through hard bidding, though of course it would not have been an unlawful agreement. Although these characterizations may be true as abstract propositions, it should be obvious that the word "agree" lacks any substantive content when used this way, which is, however, precisely the way defendants would have it used. In this particular case, defendants are in the ironic position of arguing for as vague a construction of the word "agree" as possible, but such vagueness in the use of language should be particularly avoided in the construction of criminal statutes, even when it would redound to a particular defendant's benefit.

This Court agrees with Justice Jackson's famous concurrence in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), in which he criticized the modern crime of conspiracy for being so vague as to almost defy definition. 336 U.S. at 446-47, 69 S.Ct. at 720. He described the crime as "chameleon-like," taking on a special coloration from each of the many offenses on which it may be overlaid. Justice Jackson then deplored the Supreme Court's dispensation with even the necessity to infer any definite agreement underlying a conspiracy, "although that is the gist of the offense." *Id.* at 452, 69 S.Ct. at 722.

The Court realizes that no definite agreement is required to find a conspiracy, a

---

**12.** LaFave & Scott discussed this case in the context of "wheel" conspiracies. The Court has made no attempt to define the conspiracies at issue as "wheel" or "chain" type conspira-

cies, characterizations which have been discarded by modern courts. *See United States v. Perez*, 489 F.2d 51 (5th Cir. 1973); Note, *supra*, 42 Brooklyn L.Rev. at 307.

point dramatically illustrated by *United States v. Consolidated Packaging Corp., supra*. But at some point the meaningful use of language requires a court to find that one set of events and participants were part of one agreement, while another set constituted another agreement. This is such a case. The Court is satisfied that each of these indictments is based on a separate agreement from the others. It may be true, as defendants have insisted, that the government has not set forth the full boundaries of each conspiracy in these indictments, but that is not required. *See Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). But it is not true that the agreements alleged are one and the same.

After considerable reflection and re-examination, the Court has returned to its original view, expressed in one of the earliest hearings on this motion, that each rigged highway project entailed one separately punishable agreement among those who rigged the letting. Defendants' own proof was most convincing in this regard. The proof showed that once the jobs to be bid at a particular letting had been advertised and the list of proposal holders published, a contractor desirous of a given project had to call up or otherwise communicate with all other proposal holders to persuade them not to bid on that project. If he was successful, a second communication was required to establish the figure not to bid below, *i.e.*, the amount of the complementary bids. A contractor who successfully set up a job incurred obligations to the proposal holders he had cleared off. There were often no specific quid pro quos, although it was not uncommon to make specific trade-offs. Defendants convincingly showed, however, that obligations were often non-specific, and often went unsatisfied for a substantial period. Of course, this necessarily meant that a proposal holder cleared off of a particular job might have gone along because of a previously-incurred obligation to the contractor attempting to set up the job at hand. In summary, there can be no doubt that, as a general rule, the deals that went into the rigging of a particular contract reflected transactions previously engaged in at prior lettings, and also created obligations that would be reflected in future lettings.

The fact remains, however, that a contractor who wanted a job for himself had to create an agreement between himself and all other proposal holders on that job. In this Court's view, all the participants in that agreement would be liable for a discrete section one offense, and all of them could be jointly indicted and convicted.

The Court would draw the line, however, if the government attempted to prosecute a company twice for the same agreement, as illustrated in this hypothetical. If Company A obtains an agreement from Companies B, C, and D, the proposal holders on Contract 1000, that they will provide complementary bids for A, all four companies can be convicted on that agreement. But if Company B one year later sets up Contract 2000 with Company A and others, and this agreement is facilitated by B's earlier agreement with A on Contract 1000, the government would be prosecuting the same agreement if it indicted A and B again for Contract 2000. Obviously, matters are more complex in these cases. The degree of complexity makes it virtually impossible to delineate completely separate agreements, but that it not necessary. No danger of multiple prosecutions exists so long as the number of indictments against a company does not exceed the number of jobs it received as a result of complementary bidding. For example, in the hypothetical it would be permissible to prosecute A and B on Contract 1000, or to prosecute A for Contract 1000 and B for Contract 2000. Company B should not be prosecuted twice, however, once for complementary bidding A on Contract 1000, and once for setting up Contract 2000 for itself. To prosecute a company both for complementary bidding one job and then again for setting up a job that is at least partial consideration for its prior complementary bid would amount to a double jeopardy violation. Because each of these indictments alleges that defendants successfully allocated a job or jobs to itself, that danger is not present, and the Court would find no double jeopardy violation by the prosecution of all five indictments.

### Fundamental Fairness

█ There remains, however, an independent reason for not allowing multiple prosecutions of defendant Ashland-Warren on the four indictments in which it is named. The Court has serious concerns about the fundamental fairness, in a constitutional sense, of allowing the government to proceed on multiple indictments in these cases in light of the position taken by the same Antitrust Division of the Justice Department in *United States v. Consolidated Packaging Corp.*, 575 F.2d 117 (7th Cir. 1978). In that case, the Antitrust Division successfully persuaded the Seventh Circuit that a common system of price fixing in the folding carton industry was a single conspiracy on facts that are indistinguishable in any meaningful way when compared with the bidrigging system among the competitors in Tennessee.[13] In this Court's view, *Consolidated Packaging* was wrongly decided, at least on the rationale that only a single conspiracy existed. The Seventh Circuit made the mistake of elevating a course of conduct into a single conspiracy. *See United States v. American Honda Motor Co.*, 273 F.Supp. 810 (N.D.Ill.1967). The finding was made in response to a *Kotteakos* variance argument raised by the defendant, which had been convicted for its role in an alleged national conspiracy, and argued on appeal that the proof showed only an isolated conspiracy of which it could have been a part. The finding of a single conspiracy was unnecessary because the variance was manifestly non-prejudicial. *Compare Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), with *United States v. Consolidated Packaging Corp.*, *supra*.

Not content with a simple holding of no prejudice, however, the government persisted in its single conspiracy argument and won. Now, in these indictments brought three years after *Consolidated* was decided, it is more desirable to have multiple conspiracies, and so the Antitrust Division ignores its previous position before the Seventh Circuit. This inconsistency, whatever its motivation, is intolerable. The vagueness of conspiracy may make it the darling of the prosecutor's nursery,[14] but substantive law is not an empty container whose content the Antitrust Division may regulate at its pleasure. This is not a matter of prosecutorial discretion; the prosecutor has nearly unbounded discretion as to whom to charge with what, and the Court has no quarrel with that proposition. But the prosecutor has no discretion to tinker with substantive law as the circumstances warrant, and the Antitrust Division cannot expect the courts to apply principles of conspiracy law as it sees fit. Having chosen its bed in *Consolidated Packaging*, the Antitrust Division must now sleep in it.

The government cannot argue that the courts must take a broad view of conspiracy for the purposes of a *Kotteakos* variance issue and a narrow view in reviewing a single/multiple conspiracy double jeopardy claim. *United States v. Mallah*, 503 F.2d 971, 984–85 (2d Cir. 1974) *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. McClain*, No. 8–80597 (E.D.Mich. July 2, 1979), slip op. at 13, *aff'd sub nom. United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). To do so offends the requirements of fundamental fairness and fair play embodied in the due process clause of the fifth amendment. *Cf. Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162–64, 174, 71 S.Ct. 624, 643, 650, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *Malinski v. New York*, 324 U.S. 401, 413–14, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (Frankfurter, J.,

13. As previously discussed, the Court has concluded that *Consolidated Packaging* is completely distinguishable in regard to defendants' attempt to draw Eastern Virginia bidriggers into the same conspiracies set forth in these indictments, because Eastern Virginia highway pavers are not in competition with the co-conspirators in these cases. By contrast, the co-conspirators in the Tennessee cases were often competitors among themselves in the Tennessee highway paving market, although it cannot be said that each of the fifty-six companies was in competition with all the others on each job.

14. *See* Klein, *Conspiracy—The Prosecutor's Darling*, 24 Brooklyn L.Rev. 1 (1957).

concurring); *United States v. American Honda Motor Co.*, 273 F.Supp. 810, 819–20 (alternative holding, dismissing · multiple prosecutions on due process fundamental fairness grounds). The Court is strongly inclined to dismiss three of the four indictments against defendant Ashland-Warren because allowing them to proceed in light of the Antitrust Division's position in *Consolidated Packaging* offends those "canons of decency and fairness which express the notions of justice of English-speaking peoples." *Malinski v. New York, supra,* 324 U.S. at 416–17, 65 S.Ct. at 788. Alternatively, the Court would dismiss the remaining three cases in the exercise of its inherent duty to supervise the administration of justice in this district. The Court realizes that the government has not previously been required to answer this concern, and a hearing will be conducted after the first trial for the government to show cause why the cases should not be dismissed. The government's burden will be heavy, however.

### Conclusion

The Court holds that the double jeopardy clause does not bar defendants' prosecutions in these five indictments. The claim is indeed so frivolous that an interlocutory appeal will not divest the Court's jurisdiction to proceed with the first trial on whichever indictment the government elects.[15] *See United States v. Lanci,* 669 F.2d 391 (6th Cir. 1982), at 394. Trial is set for August 30, 1982. At the conclusion of that trial, whatever the outcome, the government will be required to show cause why the remaining three indictments against Ashland-Warren should not be dismissed on fifth amendment due process grounds, or in the exercise of this Court's supervisory powers.

### APPENDIX A

1. D. R. Allen & Son

2. Alman Construction Co.
3. Ashland Oil, Inc.
4. Ashland-Warren, Inc.
5. B & B Construction, Inc. of Tennessee
6. Ballenger Corporation
7. Benward, Inc.
8. Charles Blalock & Sons
9. Bridge Builders, Inc.
10. Camden Gravel Co.
11. Couch, Inc.
12. The Dickerson Group, Inc.
13. Patrick H. Eatherly, Inc.
14. Eubank Asphalt Paving & Sealing
15. Ford Construction Co.
16. G & G Construction Co.
17. J. A. Hadley Construction Co.
18. J. R. Hayes Construction Co.
19. Highways, Inc.
20. Holland Contractors, Inc.
21. Hoover, Inc.
22. Hot-Mix, Inc.
23. Hubbs Construction Co.
24. Inter-State Paving Co.
25. Jones Brothers, Inc.
26. K Construction, Inc.
27. Kapco, Inc.
28. Ken-Tenn Construction Co.
29. Malone Brothers Construction Co.
30. J. W. Markham & Sons, Inc.
31. C. W. Matthews Construction Co.
32. McKinnon Bridge Co.
33. Mid-South Pavers, Inc.
34. Mid-Tenn Paving Co.
35. Missouri Petro. Products Co.
36. Pavement Specialists, Inc.
37. Paverite, Inc.
38. Pendleton Construction Corp.
39. Pope Paving Corp.
40. Purcell Enterprises

---

**15.** The Court severed the individual defendants Vann and Melhorn in Case No. 81–30043 so that their testimony might be presented on the double jeopardy issue after their trial, which commences on March 22, 1982. Although the Court has serious doubts that their testimony will connect 81–30043 with the convictions in Eastern Virginia, defendants will be allowed to put on Vann and Melhorn before any trial on that indictment. The Court has previously stated its intention to try 81–30043 last, in the event there are multiple trials. Transcript at 808.

41. Renfro Construction Co.
42. Rice & Papuchis Construction
43. Road Builders, Inc. of Tennessee
44. Road Pavers & Associates
45. Robco Materials, Inc.
46. Southern Roadbuilders, Inc.
47. Stein Construction Co.
48. Summers-Taylor, Inc.
49. Tennessee Asphalt Co.
50. Tennessee Blacktop, Inc.
51. Tennessee Paving Co.
52. Thomas & Associates
53. Thomas Brothers Construction Co.
54. Tillett Brothers Construction Co.
55. Walton Construction Co.
56. Whitmyer Brothers, Inc.

Compiled from Defendants' Exhibits 49–55 and the Bills of Particulars.