**UNITED STATES of America, Plaintiff,**

v.

**Steve PRICE, Defendant.**

**No. CR–81–69.**

United States District Court,
W. D. New York.

March 9, 1982.

As Amended March 31, 1982.

Roger P. Williams, U. S. Atty., Buffalo, N. Y. (David Rothenberg, Asst. U. S. Atty., Rochester, N. Y., of counsel), for plaintiff.

Howard Hertz, Berkeley, Cal., for defendant Steve Price.

CURTIN, Chief Judge.

Defendant Steve Price and four codefendants were indicted in the Western District of New York for conspiracy to manufacture methamphetamine and phenyl-2-propanone [P–2–P], Schedule II controlled substances, on July 22, 1981. A little over a year earlier in the Northern District of California, Price was indicted for conspiracy to manufacture and possess with intent to distribute methamphetamine. On April 16, 1980, he pled guilty to the California indictment. He now moves to dismiss the subsequent New York indictment on the ground it encompasses the same offense he was charged with in California, thereby violating his rights under the Double Jeopardy Clause. Whether the government is entitled to press the second indictment against him depends on the relationship between the offenses underlying each indictment.

*The California Indictment—"Price I"*

On February 13, 1980, Price and James W. Elrite were indicted for conspiracy to manufacture and possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846.[1] The indictment alleged the following three overt acts. On January 10, 1980, Price bought 38 kilograms of methylamine in Houston, Texas. Eight days later, Cynthia Simone purchased 36 bottles of P–2–P[2] in Pasadena, Texas, at Price's direction and with his money. Finally, on January 30, 1980, Price and Elrite purchased 54 bottles of P–2–P in Houston, Texas, and had them shipped to California. The conspiracy purportedly existed from June 19, 1979, through February 5, 1980.

---

1. A second count in the indictment charged Price with the use of a telephone in connection with a drug offense in violation of 21 U.S.C. § 843(b). Count II was ultimately dismissed and is unrelated to Price's double jeopardy motion.

2. "Phenyl-2-propanone," referred to in the New York indictment, is another term for "phenylacetone," referred to in the California indictment. Both are also known as "P–2–P." For the sake of consistency, "P–2–P" will be used in this decision and order.

Because Price pled guilty, there was no opportunity to develop the facts at trial. Nevertheless, the materials before the court reveal the extent of Price's participation in the conspiracy.[3] The record shows that the Price I conspiracy embraced the following activity.

As early as May 1979, Price was instrumental in an operation to buy P–2–P and methylamine from sellers in Texas and California and resell these chemicals for a substantial profit in California. According to the evidence, several other people worked with Price in this operation. Price was tied to the May 18, 1979, purchase of P–2–P by a black man using the named Jesse Jackson, Jr., in Houston, Texas. Price and an unidentified white man were seen picking up a large quantity of methylamine in Houston on January 10, 1980. Four days later, the same white man was seen picking up two and one-half times that amount of methylamine from the same Houston chemical house.

On January 18, 1980, Drug Enforcement Administration agents stopped and detained Teresa Perrone and Cynthia Simone after they purchased a large amount of P–2–P in Texas[4] for Price. This purchase was made on Simone's fifth trip to Texas to buy chemicals for Price, who paid her $1,000 per trip. Various people accompanied her on these trips, including Price, a man she knew as "John," her husband Frank, and, on her last flight, Perrone.

On January 30, 1980, Price and a man later identified as James Elrite bought a large quantity of P–2–P in Houston, Texas, and had it shipped to Sunnyvale, California. Elrite was arrested as he picked up the boxes of P–2–P from the Federal Express Office in Sunnyvale on February 5, 1980. Price was arrested several days later after

Sergeant W. J. Martin of the Drug Enforcement Administration filed a complaint against Price and Elrite.[5]

There was no evidence that Price was directly involved in the actual production of methamphetamine. In fact, at his federal parole hearing, Price expressly disclaimed any connection to any illicit methamphetamine laboratory. Nevertheless, Price was indicted and convicted, *inter alia*, for conspiracy to manufacture methamphetamine. As explained to the grand jury by a Drug Enforcement Administration forensic chemist, the reason inheres in the nature of the chemicals Price admittedly bought.

Methylamine and P–2–P are the two key chemical ingredients of methamphetamine, a Schedule II controlled narcotic. At the time Price was buying methylamine and P–2–P, neither was itself a controlled substance, although the latter became a Schedule II controlled drug on February 11, 1980. However, methylamine is used primarily to produce methamphetamine, while P–2–P is used exclusively to produce methamphetamine. Someone who possesses both P–2–P and methylamine is therefore necessarily implicated in the illegal production of methamphetamine. As such, the evidence of Price's chemical purchases was amply sufficient to support the methamphetamine production indictment.

*The Western District of New York Indictment—"Price II"*

The indictment filed in the Western District of New York accuses Price, Petar Kuburovich, Goyko Kuburovich, Eric Weyand, Lee-Ann Knox, and "other persons unknown" of conspiracy to manufacture methamphetamine and P–2–P at a clandestine laboratory on Gravel Run Road in Canisteo,

3. The record before the court includes an affidavit in support of a complaint against Price, the grand jury minutes, the transcripts of Price's Rule 11 guilty plea hearing, and minutes of Price's federal parole hearing. In addition, Price testified at a limited evidentiary hearing held in this court on December 16, 1981.

4. The affidavit of Sergeant W. J. Martin of the Drug Enforcement Administration did not indi-

cate where the two women bought the P–2–P. However, Martin later told the grand jury they were arrested in Houston.

5. Sergeant Martin's affidavit in support of his complaint also noted that Price was known to be a frequent buyer of chemical and related equipment at a supply store in Santa Clara, California.

New York, in violation of 21 U.S.C. § 846.[6] The four-count indictment also charges Price with the manufacture of methamphetamine and P–2–P in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Because this action is only in its initial stages, determining the scope of Price's involvement becomes somewhat complicated. The evidence now before the court consists of the indictment, various exhibits submitted by both Price and the government, and minutes of Terri Smith's grand jury testimony.[7] In addition, Price testified in court on December 16, 1981.

Price has also moved to produce and examine the government's witness, Terri Smith, regarding her testimony before the grand jury. Although the government agreed to let Price's attorney review Smith's testimony, *see* footnote 7, Price renewed his motion at oral argument. He maintains that Smith's testimony is essential to substantiate his double jeopardy claim.

█ Even if Smith's testimony would corroborate his own, Price is not entitled to have Smith testify in court before trial. His right to present evidence in support of his double jeopardy claim does not simultaneously entitle him to evidence normally unavailable to a criminal defendant before trial. *United States v. Stricklin*, 591 F.2d 1112, 1118 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). *See also United States v. Rivera*, 465 F.Supp. 402, 414 (S.D.N.Y.), *aff'd*, 614 F.2d 1292 (2d Cir. 1979). In any event, I have reviewed Terri Smith's grand jury testimony and am satisfied for the present that her in-court testimony would not add anything of substance to the record. Defendant's request to produce Terri Smith is therefore denied.

Proceeding to the underlying allegations, the record reveals that the government expects to prove the following facts. Sometime in January 1980, Price and his friend, Petar Kuburovich, agreed to establish an illegal laboratory to produce methamphetamine using the "PAA" process. With the PAA process, phenylacetic acid [PAA] is chemically transformed into P–2–P. The P–2–P is then combined with methylamine to produce methamphetamine, the final product. According to the government, Price bankrolled the drug enterprise from California through Petar Kuburovich. On January 17, 1980, Price wired $5,200 to Petar Kuburovich in care of the Bank of Athens in Athens, West Virginia. He transferred $4,800 to Kuburovich in care of the same bank on March 5, 1980.

Meanwhile, Petar, his brother Goyko, and some acquaintances began the process of setting up a methamphetamine laboratory. Petar, Goyko, and Richard Eslinger purchased necessary equipment and chemicals, including large quantities of PAA and methylamine, from JBR Chemical and Apparatus Company in Clifton, New Jersey, and Educational Modules in Rochester, New York. Before a site for the laboratory was selected, many, if not all, of the chemicals were shipped by bus to California and placed in storage. By May, however, an isolated cabin in Canisteo, New York, owned by Eric Weyand, a fellow student of Petar Kuburovich, was chosen as the laboratory. After that, the Kuburoviches and Eslinger continued to buy drugs and equipment but only sent some of them to California; the bulk was kept in the Canisteo cabin.

Within this same time frame, Drug Enforcement Administration agents were monitoring the actions of Petar Kuburovich, Goyko Kuburovich, and Eslinger. From June to August 1980, Drug Enforcement Administration agents surveilled the Canisteo cabin. Suspecting it to be an illic-

---

**6.** Richard Eslinger and Terri Smith are also named but not charged in the indictment. They are the defendants in a separate criminal action, CR–80–125C.

**7.** The transcript of Terri Smith's testimony before the grand jury was originally submitted to the court *in camera*. At oral argument, however, the Assistant United States Attorney agreed to provide a copy of the minutes to Price's attorney for his use alone. The transcript before the court shall remain sealed.

it methamphetamine laboratory, they obtained a search warrant on August 8, 1980, which was executed in the early morning of August 10.[8]

Terri Smith and Richard Eslinger, who were present at the time, were arrested and later indicted. The agents seized several chemistry textbooks and catalogs, a wide assortment of laboratory equipment, and a variety of chemicals, including PAA, methylamine, and homemade P–2–P and methamphetamine. In addition, agents found a handwritten note, later determined to be from Price, asking about "getting something together," and the time needed to "finish the 550" pounds. The undated note also requested information concerning the PAA process.

Terri Smith was granted immunity by the government and testified before the grand jury on March 11, 1981. Indictments against Price, Petar and Goyko Kuburovich, Eric Weyand, and Lee-Ann Knox were handed down July 22, 1981.

Price does not deny that the Canisteo site was an illicit P–2–P and methamphetamine laboratory or that the note discovered there was his. However, he strenuously disavows his alleged role in the Canisteo venture. He insists to the contrary that his admitted links to Petar Kuburovich are attributable to entirely different circumstances. Price explains these connections in the following way.

Rather than being seed money for the drug laboratory, the money Price wired to Petar Kuburovich was repayment of $10,000 Kuburovich had previously advanced him to buy P–2–P in Texas. Because of more favorable market conditions in California, Price never sent the P–2–P to Kuburovich in West Virginia. Instead, Price wired $5,200 to Kuburovich in January when Kuburovich needed to pay his college expenses. He returned the balance of Kuburovich's money after he was arrested and could no longer buy P–2–P. Finally, the note Price wrote to Kuburovich referred merely to the possibility of setting up a methamphetamine operation sometime in the unknown future. It had no connection at all with the Canisteo enterprise then in progress.

*Law*

The Double Jeopardy Clause prohibits the government from prosecuting an individual more than once for the same crime. Normally the defendant shoulders the burden of demonstrating that the offenses are the same by showing the evidence required to support a conviction in one prosecution is sufficient to support a conviction in the second prosecution. *United States v. Papa*, 533 F.2d 815, 820 (2d Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *United States v. McCall*, 489 F.2d 359, 362–63 (2d Cir. 1973), *cert. denied*, 419 U.S. 849, 95 S.Ct. 88, 42 L.Ed.2d 79 (1974). However, the United States Court of Appeals for the Second Circuit has recognized that this "same evidence" test does not adequately protect a defendant from multiple prosecutions in a narcotics conspiracy. *United States v. Perry*, 643 F.2d 38, 49 (2d Cir. 1981); *United States v. Papa, supra* at 820. Because of the unique structure of a narcotics conspiracy, the court has modified the burden of proof traditionally required of a defendant asserting a double jeopardy claim in a narcotics case. Once a defendant introduces sufficient evidence that the two purported conspiracies are in fact one, the burden shifts to the government to rebut the inference of unity with a preponderance of the evidence. *United States v. Papa, supra; United States v. Mallah*, 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). *See United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981). The government conceded at oral argument that Price had met his initial burden, Transcript p. 44. As such, Price I and Price II must be analyzed to see whether the government has sustained its burden of persuasion. Several major distinctions be-

---

8. Petar Kuburovich and Eric Weyand's motion to suppress the search warrant was denied December 15, 1981.

tween the two alleged conspiracies are strongly suggested by the record and set forth by the government.

### 1. Participants

Steve Price, James Elrite, Cynthia Simone, Simone's husband Frank, Teresa Perrone, a man named "John," and an unidentified black man using the name Jesse Jackson, Jr., are the known actors in Price I. In Price II, the alleged participants include Price, Petar Kuburovich, Goyko Kuburovich, Eric Weyand, Richard Eslinger, Terri Smith, and Lee-Ann Knox. The sole conspirator common to both enterprises is Price. There is no evidence in the record that any of the other participants in Price I were also involved in Price II although, under Price's explanation of the events, Petar Kuburovich might also have been a peripheral participant in Price I. Conversely, it is significant that unlike the conspiracies in *United States v. Papa, supra,* and *United States v. Mallah, supra,* the number of participants in each conspiracy was relatively small, making each simpler to circumscribe.

### 2. Geography

In Price I, all the purchases of P–2–P and methylamine were made in Texas and California. The resale of these chemicals took place in California. Other than Price's explanation of his aborted attempt to sell P–2–P to Petar Kuburovich, there is no indication that the Price I operation extended beyond these two states.

Price II, on the other hand, operated primarily on the east coast. The purported setup money was sent to West Virginia. The chemicals and equipment were bought exclusively in New Jersey and New York, and the laboratory was eventually established in New York. Although the chemicals were apparently shipped to California initially, once the Canisteo laboratory site was secured, most of the necessary chemicals were brought to the cabin.

### 3. Time

Price I occurred between June 1979 and February 5, 1980, the day Elrite was arrested and the latest shipment of P–2–P was seized. There is no dispute that Price's buying and selling of P–2–P and methylamine effectively ceased that day.

Although the government admits that Price II may have begun earlier, most of the activity in the Canisteo venture occurred between January 1980 and August 10, 1980, when the methamphetamine laboratory was seized and Smith and Eslinger were arrested. Other than the month or more overlap of time, there is no evidence that either conspiracy subsumed the other in terms of time, although each lasted substantially longer than this several-day period. *Cf. United States v. Rivera,* 465 F.Supp. at 412 (no double jeopardy despite wholly subsumed time period).

### 4. Nature of Activity and Price's Role

By far the most persuasive evidence of two independent conspiracies relates to the entirely different activity involved and the different roles Price allegedly assumed in each operation. In Price I, the conspirators bought and sold methylamine and P–2–P, methamphetamine's precursor chemicals. Price expressly disavowed any direct involvement in the actual manufacture of the final product.

Unlike Price I, the Price II enterprise did not utilize prepurchased P–2–P. Rather, the participants manufactured P–2–P themselves before combining it with methylamine to produce the methamphetamine. Just as significantly, Price was directly involved in the Price II enterprise at the top as its chief financier, whereas in Price I he acted in a much more limited and delineated capacity.

█ As I alluded to previously, Price does not claim ignorance of the Price II methamphetamine operation. Rather, he explains the evidence of his ties to Petar Kuburovich in a far different manner than the government does and denies any involvement, either direct or remote, in the Price II con-

spiracy. Even so, the marked distinctions between Price I and Price II strongly suggest they were separate and discreet conspiracies. I am satisfied that the government has amply demonstrated that the two narcotics enterprises lack the cohesion of geography, time, participants, and mode of operation which might have given rise to a valid double jeopardy claim. *United States v. Perry*, 643 F.2d at 49; *United States v. Papa*, 533 F.2d at 822.[9]

Price argues that double jeopardy attaches, nevertheless, because the mere buying and selling of P–2–P necessarily implicates him in the manufacture of methamphetamine. In fact, it was on this basis that he was convicted for the production of methamphetamine in Price I even though the government's evidence related to nothing more than the purchase and sale of P–2–P. Thus, he concludes, his indictment for the production of methamphetamine in the Western District of New York is necessarily circumscribed by his conviction for the manufacture of methamphetamine in the Northern District of California.

The flaw in Price's argument is that it assumes that a prosecution for a legal offense which is provable in one of several ways automatically precludes another prosecution for the same legal offense which is provable in a different way. Price's logic is sound only if the facts underlying the first prosecution are either identical to or unavoidably interlinked with the facts underlying the second prosecution. The double jeopardy clause does not bar a prosecution based on the same criminal statute as an earlier prosecution when the sum of activity predicating the latter offense is different from that predicating the former. Despite Price's initial showing, the government has shown that sufficient differences between the two narcotics operations exist to overcome Price's double jeopardy claims at this time.

As a final matter, it is important to observe that my decision today is based only on the evidence presently before the court.

If the proof, as it develops at trial, reveals that the two schemes are merely two segments of the same conspiracy, there is no reason I cannot vacate this decision upon a proper motion by defendant. *United States v. Rivera*, 468 F.Supp. at 413; *United States v. Stricklin*, 591 F.2d at 1119. For the moment, however, I am satisfied that the government has shown that Price I and Price II comprise independent conspiracies. Price's motion to dismiss the indictment on double jeopardy grounds is therefore denied without prejudice.

So ordered.

---

**9.** Whether Price was actually involved in Price II, which he denies, is an entirely different question from whether the two conspiracies are the same. ⸺