UNITED STATES of America

v.

**WALDBAUM, INC.; Kenneth Abrahams; and Raymond Korfant.**

**Crim. No. B 84–50 (JAC).**

United States District Court, D. Connecticut.

Jan. 31, 1985.

Melvin Lublinsky, John J. Greene, Martha E. Gifford, Robert Einstein, Dept. of Justice, Antitrust Div., New York City, for the Government.

Thomas C. Longo, Philip J. Korey, Thomas G. Longo Co., L.P.A., Cleveland, Ohio, for defendant Korfant.

## RULING ON DEFENDANT KORFANT'S MOTION TO DISMISS ON GROUND OF DOUBLE JEOPARDY

JOSÉ A. CABRANES, District Judge:

The question presented is whether the indictment of Raymond Korfant in this case exposes him to double jeopardy in violation of the Fifth Amendment to the United States Constitution.[1]

In an indictment returned on August 15, 1984 by a grand jury impaneled in this District, the United States charges, *inter alia*, that Korfant participated in a so-called "horizontal" conspiracy to fix the prices of certain food products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. During the period in question (from October 1978 to late 1980), Korfant was Senior Vice President for Marketing and Sales of First National Supermarkets, Inc. ("Finast").

Korfant also had been indicted on October 10, 1980 by a grand jury impaneled in the United States District Court for the Northern District of Ohio, in *United States*

---

**1.** The Fifth Amendment provides, in relevant part, that "[no] person [shall] be subject for the same offense to be twice put in jeopardy of life or limb."

*v. First National Supermarkets, Inc., dba Pick-N-Pay Supermarkets, et al.,* Docket No. Cr. 80–175 (*"Korfant I"*). In the *Korfant I* indictment, Korfant also was charged with participation in a horizontal conspiracy to fix the prices of certain food products, in violation of 15 U.S.C. § 1. In response to the *Korfant I* indictment, Korfant on February 19, 1982 entered a plea of *nolo contendere.* Upon that plea he was sentenced by Judge Thomas D. Lambros. Korfant's sentence of incarceration for a period of one and one-half years was suspended and Judge Lambros ordered that he serve three years on probation and pay a fine of $75,000.

By motion filed in this court on October 9, 1984, Korfant claims that the Connecticut prosecution (*"Korfant II"*) is barred under the Double Jeopardy Clause of the Fifth Amendment. Following an evidentiary hearing on the motion, and a consideration of memoranda submitted by the parties and the full record of this case, the court enters the following findings of fact and conclusions of law pursuant to Rule 12(e), Fed.R.Crim.P.

Korfant's Motion to Dismiss is denied.

## FINDINGS OF FACT

### I. *Korfant I Indictment*

*Participants*

1. On October 10, 1980, a federal grand jury sitting in the Northern District of Ohio, Eastern Division, returned a two-count indictment against First National Supermarkets, Inc., dba Pick-N-Pay Supermarkets; Fisher Foods, Inc., dba Fazio's; Association of Stop-N-Shop Super Markets; Richard J. Bogomolny; Raymond M. Korfant; John Fazio; and Charles A. Rini. (*Korfant I* indictment, ¶¶ 2–4)

2. On February 19, 1982, all the defendants entered pleas of *nolo contendere.* (Testimony of Raymond Korfant, Certified Official Transcript of Hearing Held on December 18, 1984 [filed Dec. 28, 1984] ["Korfant, Tr."] 559)

3. Finast was formed in May 1978 as a result of the merger of Pick-N-Pay Supermarkets, Inc. ("Pick-N-Pay") and First National Stores, Inc. (Korfant Ex. B [*"Korfant I* Bill of Particulars"], at 1; Korfant, Tr. 458–463)

4. From at least 1976 to May 1978, Pick-N-Pay operated supermarkets in the Cleveland, Ohio marketing area (Cuyahoga and Lake counties), Toledo, Ohio, and Canton, Ohio. Most of its stores were in Cuyahoga County. During this time, Pick-N-Pay operated no supermarkets in Connecticut or Western Massachusetts. (*Korfant I* indictment, ¶ 2; Testimony of Murriel A. Flategraff, Certified Official Transcript of Hearing Held on November 29, 1984 [filed Dec. 17, 1984] ["Flategraff, Tr."] 175–176, 185–186; Testimony of Matthew A. Palma, Certified Official Transcript of Hearing Held on December 18, 1984 [filed Dec. 28, 1984] ["Palma, Tr."] 400)

5. From at least 1976 to May 1978, First National Stores, Inc. operated supermarkets in New York and the New England region, including Connecticut and Western Massachusetts. It operated no supermarkets in Ohio. (Flategraff, Tr. 180–181, 198)

6. From May 1978 to late 1980, Finast operated supermarkets in Ohio (doing business as "Pick-N-Pay") as well as in Connecticut and Western Massachusetts (doing business as "Finast"). (Flategraff, Tr. 181–182, 186)

7. During the time periods covered by the *Korfant I* and *Korfant II* indictments, Fisher Foods, Inc., dba Fazio's ("Fisher"),[2] operated supermarkets in Cuyahoga County, Ohio. It operated no supermarkets in Connecticut or Western Massachusetts. (*Korfant I* indictment, ¶ 2; Flategraff, Tr. 188; Testimony of Harry Cooper, Certified Official Transcript of Hearing Held on November 29, 1984 [filed Dec. 17, 1984] ["Cooper, Tr."] 286; Palma, Tr. 400)

8. During the time periods covered by the *Korfant I* and *Korfant II* indictments, the Association of Stop-N-Shop Super Mar-

---

**2.** Fisher Foods was also known as Fisher-Fazio.

(Korfant, Tr. 511)

kets ("Stop-N-Shop"),[3] a voluntary association of retail food corporations, and its members operated supermarkets in Cuyahoga County, Ohio. They did not operate supermarkets in Connecticut or Western Massachusetts. (*Korfant I* indictment, ¶ 3; Flategraff, Tr. 186–188)

9. Richard J. Bogomolny was the President and Chief Executive Officer of Finast during all or part of the time periods covered by the *Korfant I* indictment. (*Korfant I* indictment, ¶ 4)

10. Korfant was Finast's Senior Vice President for Marketing and Sales during all or part of the time periods covered by the *Korfant I* indictment. (*Id.;* Korfant, Tr. 451–452)

11. John Fazio was Fisher's President and Chief Executive Officer during all or part of the time periods covered by the *Korfant I* indictment. (*Korfant I* indictment, ¶ 4)

12. Charles A. Rini was President of Stop-N-Shop during all or part of the time periods covered by the *Korfant I* indictment. (*Id.*)

13. Julie Kravitz, who died in 1979, was Chairman of the Board of Finast during all or part of the time periods covered by the *Korfant I* indictment, and was an unindicted co-conspirator in both counts of that indictment. (*Korfant I* Bill of Particulars, at 1–2)

14. Murriel A. Flategraff, Finast's Vice President for Meat Buying and Merchandising during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in Count II of the *Korfant I* indictment. (*Id.;* Flategraff, Tr. 174)

15. Charles Fazio, Fisher's Vice President, Northern Ohio Division, during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in both counts of that indictment. (*Korfant I,* Bill of Particulars, at 1–2)

16. Marshall T. Italiano, Fisher's President, Northern Ohio Division, during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in Count II of that indictment. (*Id.*)

17. George R. Caster, Executive Director of Stop-N-Shop during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in both counts of that indictment. (*Id.*)

18. Matthew A. Palma, Stop-N-Shop's Director of Meat Sales during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in Count II of that indictment. (*Id.* at 3)

19. Charles A. Rego, an executive of several members of Stop-N-Shop during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in Count II of that indictment. (*Id.*)

20. Sam A. Rego, an executive of several members of Stop-N-Shop during all or part of the time periods covered by the *Korfant I* indictment, was an unindicted co-conspirator in Count I of that indictment. (*Id.*)

21. The supermarket chains that participated in the *Korfant I* price-fixing activity were Finast, Stop-N-Shop and Fisher. Waldbaum, Inc. ("Waldbaum") did not participate in that activity. (*Korfant I* indictment, ¶ 2; Korfant, Tr. 507, 510, 539, 540)

22. The supermarket chains that participated in the *Korfant I* price-fixing activity did not even consider involving Waldbaum in that activity. (Korfant, Tr. 509, 512, 537)

*Statutory Offense*

23. In each count of the *Korfant I* indictment, the defendants and co-conspirators were charged with engaging in a conspiracy in unreasonable restraint of interstate trade and commerce in the retail sale of grocery products and meat items, in

---

**3.** Stop-N-Shop is not related in any way to The Stop & Shop Companies, Inc. that operates su-

permarkets in Western Massachusetts. (Flategraff, Tr. 186–188)

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (*Korfant I* indictment, ¶ 10)

24. The conspiracy charged in each count of the *Korfant I* indictment consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators to fix, raise, stabilize, and maintain the advertised prices and everyday shelf prices of grocery products and the advertised prices of some meat items. (*Id.* ¶ 11, 17)

25. The prices of a wide variety of grocery products and some meat items were the subjects of the conspiracy charged in each count of the *Korfant I* indictment. Eggs and holiday turkeys were two of the products subject to the conspiracy charged in Count II of the *Korfant I* indictment. (*Korfant I* Bill of Particulars, at 9–14, 20–27)

*Time Periods of the Charged Conspiracies*

26. The conspiracy charged in Count I of the *Korfant I* indictment began at least as early as 1976 and continued at least to June 1977, the exact dates being unknown to the grand jury. (*Korfant I* indictment, ¶ 10)

27. The conspiracy charged in Count II of the *Korfant I* indictment began at least as early as August 1977 and continued to 1980. (Palma, Tr. 383; Korfant, Tr. 505–506, 514–516)

*Geographic Scope of the Charged Conspiracies*

28. The geographic scope of the conspiracies charged in the *Korfant I* indictment was Cuyahoga County, Ohio. (*Korfant I* indictment, ¶¶ 10, 16; Flategraff, Tr. 196–197; Palma, Tr. 401; Korfant, Tr. 511)

*Overt Acts in Furtherance of the Conspiracies*

29. All the participants in meetings, telephone conversations and exchanges of documents in furtherance of the price-fixing activity in *Korfant I* were representatives of Finast, Fisher or Stop-N-Shop. Waldbaum did not participate in any of the meetings, telephone conversations or exchanges of documents in furtherance of that activity. (*Korfant I* Bill of Particu-

lars, at 10–14, 20–27; Flategraff, Tr. 209; Korfant, Tr. 511)

## II. *Korfant II Indictment*

*Participants*

30. On August 15, 1984, a federal grand jury sitting in this district returned a one-count indictment against Waldbaum, Kenneth Abrahams and Korfant (*Korfant II* indictment, ¶¶ 2–4, 14)

31. During the time periods covered by the *Korfant I* and *Korfant II* indictments, Waldbaum operated supermarkets in Connecticut and Western Massachusetts. It operated no supermarkets in Ohio. (*Korfant II* indictment, ¶ 1; Flategraff, Tr. 188–189; Cooper, Tr. 284)

32. Kenneth Abrahams was Vice President of Waldbaum and President of Waldbaum's Food Mart Division during the time period covered by the *Korfant II* indictment. (*Korfant II* indictment, ¶ 2)

33. Korfant was Finast's Senior Vice President for Marketing and Sales during all or part of the time period covered by the *Korfant II* indictment. (*Id.*, ¶ 3; Korfant, Tr. 451–452)

34. Finast is an unindicted co-conspirator in the *Korfant II* indictment. (*Korfant II* Bill of Particulars, at 3, ¶ 5)

35. Murriel A. Flategraff, Finast's Vice President for Meat Buying and Merchandising during all or part of the time period covered by the *Korfant II* indictment, is an unindicted co-conspirator therein. (*Id.*; Flategraff, Tr. 174)

36. John M. Davey, an employee of Finast during all or part of the time period covered by the *Korfant II* indictment, is an unindicted co-conspirator therein. (*Korfant II* Bill of Particulars, at 3, ¶ 5; Testimony of John Davey, Certified Official Transcript of Hearing Held on December 18, 1984 [filed Dec. 28, 1984] 411–412)

37. Virginia F. Higley, an employee of Finast during all or part of the time period covered by the *Korfant II* indictment, is an unindicted co-conspirator therein. (*Korfant II* Bill of Particulars, at 3, ¶ 5)

38. David C. Barr, an employee of Finast during all or part of the time period covered by the *Korfant II* indictment, is an unindicted co-conspirator therein. (*Id.*)

39. Harry Cooper, an employee of Waldbaum's Food Mart Division during all or part of the time period covered by the *Korfant II* indictment, is an unindicted co-conspirator therein. (*Id.;* Cooper, Tr. 279)

40. The supermarket chains that participated in the price-fixing activity in Connecticut and Western Massachusetts were Finast and Waldbaum. Neither Fisher nor Stop-N-Shop participated in that activity. (Korfant, Tr. 516)

*Statutory Offense*

41. In *Korfant II*, the defendants and co-conspirators are charged with engaging in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in the retail sale of grocery products and meat items in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (*Korfant II* indictment, ¶¶ 6, 10)

42. The conspiracy charged in the *Korfant II* indictment consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators to fix the prices of eggs and holiday turkeys. (*Korfant II* indictment, ¶ 11; Bill of Particulars, at 2, ¶ 3; Flategraff, Tr. 201-204; Cooper, Tr. 281)

*Time Period of the Charged Conspiracy*

43. The conspiracy charged in the *Korfant II* indictment began in or about October 1978 and continued until late 1980, the exact dates being unknown to the grand jury. (*Korfant II* indictment, ¶ 10; Supp. Bill of Particulars, at 1-2)

*Geographic Scope of the Charged Conspiracy*

44. The geographic scope of the conspiracy charged in the *Korfant II* indictment was Connecticut and Western Massachusetts. (*Korfant II* indictment, at 3, ¶ 11; Flategraff, Tr. 201-203)

*Overt Acts in Furtherance of the Conspiracy*

45. All the participants in discussions in furtherance of the conspiracy charged in *Korfant II* were representatives of either Waldbaum or Finast. (*Korfant II* Supp. Bill of Particulars, at 1-2; Flategraff, Tr. 199; Korfant, Tr. 548)

### III. *Finast's Role in Korfant I and Korfant II*

46. At the times covered by the *Korfant I* and *Korfant II* indictments, Pick-N-Pay (and later Finast dba Pick-N-Pay) was a major actor in price-fixing activity in the Cleveland area that was the subject of *Korfant I.* (Korfant, Tr. 517)

47. In early 1978, when the Pick-N-Pay merger with First National Stores, Inc. was planned but not formally consummated, Pick-N-Pay took steps to initiate price-fixing activity in a wide variety of food products (including holiday turkeys and eggs) in Connecticut and Western Massachusetts. (Korfant, Tr. 518-520, 524-528)

48. Before the initiation of price fixing in the Connecticut and Western Massachusetts market by Pick-N-Pay, that market was competitive. (Korfant, Tr. 523-525)

49. After the merger of Pick-N-Pay and First National Stores, Inc., Finast (the successor corporation embracing the two entities) began fixing prices of food products in the Connecticut and Western Massachusetts market. (Korfant, Tr. 517)

50. Finast (and Pick-N-Pay prior to the merger with First National Stores, Inc.) had a corporate strategy of engaging in price-fixing activity in order to maximize profits in each of the markets in which it operated. (Flategraff, Tr. 206; Korfant, Tr. 469-474, 502-505, 525, 540)

51. Finast considered and directed its price-fixing activities in the Cleveland market and in the Connecticut and Western Massachusetts market at internal corporate strategy meetings held in both Cleveland and Connecticut and in communications between Finast agents in Cleveland and Connecticut. (Flategraff, Tr. 180-184, 266-267; Korfant, Tr. 455, 470-474, 504-506, 542-543, 561-563)

### CONCLUSIONS OF LAW

The Fifth Amendment to the United States Constitution provides, in pertinent

part, that "[no] person [shall] be subject for the same offense to be twice put in jeopardy of life or limb." Among other things, the so-called Double Jeopardy Clause "protects against a second prosecution for the same offense after conviction...." *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977), *quoting North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). *See also Oregon v. Kennedy,* 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982).

Traditionally, the "same evidence" test has been used to determine whether the "same offense" is involved in two prosecutions. Under that test, "offenses are the 'same' for the purposes of the double jeopardy guarantee when 'the evidence required to support a conviction upon one of them [the indictments] would have been sufficient to warrant conviction upon the other.'" *United States v. Mallah,* 503 F.2d 971, 985 (2d Cir.1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), *quoting United States v. Kramer,* 289 F.2d 909, 913 (2d Cir.1961). *See also United States v. DeFillipo,* 590 F.2d 1228, 1234–35 (2d Cir.), *cert. denied,* 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979).

■ However, where the double jeopardy issue arises in consecutive conspiracy cases, the same evidence test has been held to be inadequate because of the ability of the prosecutor to divide one overall conspiracy into smaller separate agreements simply by alleging different overt acts. *United States v. Mallah, supra,* 503 F.2d at 985 (narcotics conspiracy); *United States v. Papa,* 533 F.2d 815, 820 (2d Cir.1976), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976) (same). In place of the same evidence test, courts have employed what has come to be known as the "totality-of-the-circumstances" (or "common objective") test. Under this test, the inquiry focuses on the overlap of various characteristics of the two purported conspiracies. *See United States v. Mallah, supra,* 503

F.2d at 981–87; *United States v. Papa, supra,* 533 F.2d 820–22; *United States v. Price,* 533 F.Supp. 1183, 1187–89 (W.D. N.Y.1982) (narcotics conspiracy); *United States v. Beachner Construction Company, Inc.,* 555 F.Supp. 1273, 1276–82 (D.Kan.1983), *aff'd,* 729 F.2d 1278 (10th Cir.1984) (antitrust—price-fixing conspiracy); *United States v. Wilshire Oil Company of Texas,* 427 F.2d 969, 975–77 (10th Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970) (same); *United States v. Sinito,* 723 F.2d 1250, 1257–59 (6th Cir.1983) (RICO conspiracy); *United States v. Tercero,* 580 F.2d 312, 315–17 (8th Cir. 1978) (narcotics conspiracy); *United States v. Jabara,* 644 F.2d 574, 577 (6th Cir.1981) (same); Note, *"Single vs. Multiple" Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes,* 65 Minn.L.R. 295, 310–11 (1980) (Note).

\*　　\*　　\*

Assuming *arguendo* that Korfant has met his burden of presenting the requisite "sufficient evidence" needed to shift the burden to the Government on the issue of whether only one conspiracy to fix prices existed, *see United States v. Mallah, supra,* 503 F.2d at 985; *United States v. Papa, supra,* 533 F.2d at 820–21; *United States v. Price, supra,* 533 F.Supp. at 1187, the court concludes that the Government has shown, by a preponderance of the evidence, that two conspiracies existed.

### I.

■ Because the Government's position is amply supported under the prevailing totality-of-the-circumstances test, the court need not address, much less adopt, the *per se* rule enunciated by the court in *United States v. Ashland-Warren, Inc.,* 537 F.Supp. 433, 441–45 (M.D.Tenn.1982)— that, as a matter of law, one conspiracy in a horizontal price-fixing case involving two markets cannot exist unless there is an overlap of at least two competitors/conspirators between the two markets.[4]

---

**4.** In any event, absent authoritative guidance by

our own Court of Appeals, the decision of a

## II.

■ It is not disputed that the factors to be considered in the totality-of-the-circumstances test include (1) the criminal offenses charged in the indictments; (2) overlap of participants; (3) overlap of time; (4) similarities in methods of operation; (5) overt acts in common; (6) geographic scope of the purported conspiracies or location where overt acts occurred; (7) the extent to which the purported conspiracies share a common objective and; (8) degree of interdependence between the purported conspiracies. Government's Post-Hearing Memorandum in Opposition to Defendant Korfant's Motion to Dismiss the Indictment Under the Double Jeopardy Clause (filed Jan. 14, 1985) ("Government Memorandum") at 8–9. *See United States v. Mallah, supra,* 503 F.2d at 985–986 (factors 1, 2, 3, 6, 8); *United States v. Papa, supra,* 533 F.2d at 821–22 (factors 2, 3, 5, 8); *United States v. DeFillipo, supra,* 590 F.2d at 1234–35 (factors 2, 3, 6, 7); *United States v. Price, supra,* 533 F.Supp. at 1188 (factors 1, 2, 3, 4, 6); *United States v. Beachner Construction Company, Inc., supra,* 555 F.Supp. at 1277–78 (factors 1, 2, 7, 8); *Ashland-Warren, supra,* 537 F.Supp. at 445–47 (factors 2–8); *United States v. Tercero, supra,* 580 F.2d at 313–316 (factors 2, 3, 4, 5, 6, 8); *United States v. American Honda Motor Company,* 271 F.Supp. 979, 983–985 (N.D.Cal.1967) (factors 2, 6, 7); Note, *supra,* 65 Minn.L.R. at 310–16 (factors 2–8).

### A.

■ The factors of criminal offense, time and methods suggest the existence of a single conspiracy.

#### 1.

There is no dispute that the offense with which Korfant is charged in *Korfant I* and *Korfant II* is the same—namely, a horizontal conspiracy to fix the prices of food products, including eggs and holiday turkeys. *See* Findings of Fact, *supra,* ¶¶ 23–25, 41–42.

#### 2.

There is a significant time overlap between the two purported conspiracies. Indeed, the time period alleged in *Korfant II* (October 1978-late 1980) is nearly subsumed by the time period of the conspiracy to which Korfant pleaded *nolo contendere* in Count II of the *Korfant I* indictment (August 1977–1980). *See* Findings of Fact, *supra,* ¶¶ 26–27, 43.

#### 3.

The methods of operation of both purported conspiracies were the same. These methods (Finast strategy sessions, communications with competitors and "price checking") were used to initiate and monitor price-fixing activity in both markets. Korfant (and Finast) played similar, central roles with regard to price-fixing activity in the Cleveland market as well as in the Connecticut and Western Massachusetts market. Finast executives, including (most notably) Korfant, coordinated the company's price-fixing strategy in both markets. *See* Findings of Fact, *supra,* ¶¶ 46–51.

### B.

The factors of overt acts, geographic scope (or the location of the overt acts), overlap of actors, common objective and interdependence favor the Government's position that two separate conspiracies are involved.

#### 1.

In spite of the unified strategy of Finast, the alleged overt acts in *Korfant I* (the communications among competitors in the Cleveland market) and those in *Korfant II* (the communications between competitors in the Connecticut and Western Massachusetts market) are different. *See* Findings of Fact, *supra,* ¶¶ 29, 45.

#### 2.

Although Finast coordinated its price-fixing strategy for each market at internal corporate meetings held in the Cleveland

---

district court in a Circuit other than our own is not binding on this court. *See, e.g., Securities and Exchange Commission v. Shapiro,* 494 F.2d 1301, 1306, n. 2 (2d Cir.1974) (Hays, J.).

market and the Connecticut and Western Massachusetts market and in intra-firm communications between locations in both markets, the actual price-fixing activity engineered by Finast occurred in two distinct geographical markets. *See United States v. Wilshire Oil Company of Texas, supra,* 427 F.2d at 976–77; *United States v. Ashland-Warren, Inc., supra,* 537 F.Supp. at 445. Finast's co-conspirators were not parties to these internal corporate meetings or intrafirm communications. *See* Findings of Fact, *supra,* ¶¶ 28, 44, 51.

3.

Korfant contends that because several employees of Finast (including Korfant) were involved in both *Korfant I* and *Korfant II,* there is a significant overlap of criminal actors and one that points to the existence of a single conspiracy. However, the conspiracy that the law forbids is a conspiracy among *competitors* and, therefore, in a horizontal price-fixing case, the relevant actors for purposes of a double jeopardy claim are the firms that compete with each other. *See* Government Memorandum at 9–12. In these circumstances, only Finast could be said to "overlap" the indictments in *Korfant I* and *Korfant II.*

The overlap of only one criminal actor strongly suggests the existence of separate conspiracies. *See e.g., United States v. Papa, supra,* 533 F.2d at 821–22; *United States v. Price, supra,* 533 F.Supp. at 1188; *United States v. Ashland-Warren, Inc.,*

*supra,* 537 F.Supp. at 445; Note, *supra,* 65 Minn.L.R. at 313. Indeed, the *per se* rule of *United States v. Ashland-Warren, Inc., supra,* 537 F.Supp. at 441–45, would seem to be grounded upon a recognition of this fact. It is clearly established that a single actor of central importance [5] may engage in similar but different conspiracies. *See, e.g., United States v. Papa, supra,* 533 F.2d at 820–22 (one common central figure—double jeopardy claim rejected despite overlap of time and common location). *See also, United States v. Wilshire Oil Company of Texas, supra,* 427 F.2d at 976–77 (finding two separate conspiracies in a horizontal price-fixing case even though there was an overlap of eight price-fixing firms between two markets).

4.

Although it is clear that the objective of each of the purported conspiracies was the elimination of price competition and the attainment of higher profits for the firms involved in each market, it is equally clear that the objectives of the actors in each market were limited to the fixing of prices in that particular market. *See generally United States v. Wilshire Oil Company of Texas, supra,* 427 F.2d at 976–77 (common objective factor linked to geographic scope); *United States v. Beachner Construction Company, Inc., supra,* 555 F.Supp. at 1277 (same). Moreover, no evidence has been adduced to suggest, much less show, that criminal actors in either

---

**5.** In other contexts, a different conclusion with respect to the common actor criterion might be suggested by authorities that have upheld double jeopardy claims in situations in which the sole common actor is the principal organizer or the "core figure" in the different relevant arenas. *See United States v. Mallah, supra,* 503 F.2d at 982–986 (drug conspiracy—however, implicit finding of overlap of actors [*see United States v. Papa, supra,* 533 F.2d at 820–821]); *United States v. American Honda Motor Company, supra,* 271 F.Supp. at 980–981 (vertical price-fixing, explicit findings of common objective and interdependence); *United States v. American Honda Motor Company,* 273 F.Supp. 810 (N.D.Ill.1967) (same, *in haec verba*); Note, *supra,* 65 Minn.L.R. at 313. *See also United States v. Robinson, supra,* 588 F.2d 1041, 1042–1044 (5th Cir.), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979) (only two core

figures in common where five were necessary to constitute the offense—operation of "gambling *business*" [not *conspiracy* ] in violation of 18 U.S.C. § 1955). Although it is not disputed that in the price-fixing activity in the Cleveland market (*Korfant I* ) and in the Connecticut and Western Massachusetts market (*Korfant II* ) Finast was a major organizer and Korfant was one of the pivotal "players" in each market on behalf of Finast, *see* Findings of Fact, *supra,* ¶¶ 46, 47, 49, this case is distinguishable from the authorities cited above because there is no evidence here to support findings of an implicit overlap of criminal actors, or interdependence and common objective. In addition, Finast's (and Korfant's) overall involvement in *Korfant I* and *Korfant II* was not pervasive enough to merit a conclusion that it was a core conspirator (or "kingpin").

market, other than Finast and its agents, had any knowledge of the interests or activities (criminal or otherwise) of criminal actors in the other market. In these circumstances, the existence in both markets of one common criminal actor (Finast) is not enough to permit the conclusion that the price-fixing activities in the Connecticut and Western Massachusetts market and those in the Cleveland market shared a "common objective."

5.

On the issue of interdependence of the purported conspiracies, no linkage between the price-fixing activity in the respective markets has been shown. *See* Findings of Fact, *supra*, ¶¶ 7–8, 21–22, 40. While Korfant and his corporate principal were central actors in price-fixing activity in both markets, the record is barren of any suggestion that the other actors with whom Korfant fixed prices in one market knew (or had an interest in knowing) of the existence of Korfant's corporate cohorts in the other market, *id.*, or were aware of the occurrence of price-fixing activity in the other market, much less that the two conspiracies were dependent on one another in any way. In fact, the evidence shows that the price-fixing activities in each market were, except for the Finast connection, unrelated.

### Conclusion

For the reasons stated above, the Government has shown by a preponderance of the evidence that two different conspiracies were involved in *Korfant I* and *Korfant II*. When all of the circumstances of the two alleged conspiracies are compared, including the lack of overlap of actors (other than Finast), the absence of interdependence, the absence of common objectives, the separate geographic arenas, and the different overt acts, it is clear that the prosecution of these two conspiracies does not violate the Double Jeopardy Clause.

Accordingly, Korfant's Motion to Dismiss Indictment Under the Double Jeopardy Clause is denied.

It is so ordered.