**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4402
_____

BARRY GIBBS,

Appellant

v.

ROBERT SHANNON; PA STATE ATTORNEY GENERAL
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 3-08-cv-00462)
District Judge: Honorable Edwin M. Kosik
_____

Argued: April 8, 2015

Before: AMBRO, VANASKIE, and SHWARTZ, *Circuit Judges*.

(Opinion Filed: July 2, 2015)

Mark A. Berman, Esq. [ARGUED]
Hartmann, Doherty, Rosa, Berman & Bulbulia
65 Route 4 East
River Edge, NJ 07661
        *Counsel for Appellant*

James P. Barker, Esq. [ARGUED]
William R. Stoycos, Sr., Esq.
Office of Attorney General of Pennsylvania
Appeals & Legal Services
Strawberry Square
16th Floor
Harrisburg, PA 17120

*Counsel for Appellee*

_____

OPINION[*]

_____

VANASKIE, *Circuit Judge*.

This appeal in a habeas corpus proceeding brought by Appellant Barry Gibbs under 28 U.S.C. § 2254 is before us on a certificate of appealability that we issued on the following question: "whether the District Court erred in denying Gibbs's claim that the Commonwealth presented insufficient evidence to sustain a jury verdict finding him guilty of two separate conspiracies." Order, Apr. 29, 2014, *Gibbs v. Shannon, et al.*, No. 13-4402 (3d Cir. 2014). For the reasons that follow, we will affirm the District Court's denial of Gibbs's habeas corpus petition.

I.

We briefly summarize the relevant background, reserving our discussion of additional facts as they become pertinent to our analysis below. On March 27, 1984, Sharon Burke, aided by several co-conspirators, solicited Gibbs to murder her husband, Wayne Burke. After Gibbs agreed to be the shooter, Sharon Burke provided him with a gun, explained the layout of the security office where her husband worked, and drove him to the scene. At her house and during the trip to the security office, Sharon Burke explained that another security officer, George Mehl, would also be on duty that night,

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

and if necessary, Gibbs should be prepared to shoot or kill Mehl, too, if he interfered with Gibbs's effort to kill Wayne Burke. Gibbs assented to take out Mehl, if necessary. Once at the security office, Gibbs approached a side window and fired six shots at the two guards. Mehl was hit in the head and died. Wayne Burke, however, was unharmed.

Shortly thereafter, Gibbs was charged in a criminal information with five separate counts stemming from the shooting: one count of attempted criminal homicide as to Wayne Burke, one count of criminal homicide for the death of Mehl,[1] two counts of criminal conspiracy to commit homicide (one for each intended victim), and one count of aggravated assault as to Wayne Burke.

There then ensued protracted proceedings that included three separate trials, numerous state court appeals, two federal habeas proceedings, and two prior appeals to our Court. We described the lengthy procedural history of this case in *Gibbs v. Frank*, and a brief review is helpful in framing our analysis now:

> Three times a jury has convicted Gibbs of the same criminal homicide. The Pennsylvania Supreme Court vacated Gibbs' first conviction after concluding that certain statements he made to the police were induced in violation of his Fifth Amendment rights. At Gibbs' first trial, a government psychiatrist who had conducted a court-ordered examination of Gibbs testified about statements made by Gibbs to the psychiatrist; the psychiatrist's testimony was presented to rebut Gibbs' diminished capacity defense. At Gibbs' second trial, the government psychiatrist again testified about Gibbs' statements. But at the second trial Gibbs did not raise a diminished capacity defense. Accordingly, on habeas corpus, this Court set aside Gibbs' second conviction, ruling that

---

[1] The original information charged Gibbs with the attempted murder of George Mehl. A second information changed that charge from attempted murder to homicide.

3

> Gibbs' statements to the psychiatrist in a court-ordered examination were compelled, and hence the presentation of the psychiatrist's testimony as part of the government's affirmative case—i.e., in a non-rebuttal setting—violated Gibbs' Fifth Amendment rights.

500 F.3d 202, 203 (3d Cir. 2007).

After vacating his second conviction, we ordered that he be retried or released. *Id.* During the course of this trial, two of his co-conspirators, Bonnie Hagen[2] and Betsy Burke, testified against him. On July 5, 2005, the jury convicted Gibbs of third degree murder and conspiracy to commit third degree murder for killing Mehl, and aggravated assault and conspiracy to commit aggravated assault for attempting to shoot Wayne Burke.[3] On September 2, 2005, Gibbs was sentenced to a prison term of 10 to 20 years on the third degree murder conviction, and consecutive 5 to 10 year prison terms on the two conspiracy convictions and the aggravated assault conviction, for an aggregate prison sentence of 25 to 50 years.

On direct appeal to the Superior Court of Pennsylvania, Gibbs argued that the evidence was insufficient to sustain both conspiracy convictions. On February 14, 2007, the Superior Court affirmed the conviction and sentence in an unpublished opinion. In addressing Gibbs's conspiracy convictions, the Superior Court explained:

---

[2] Bonnie Hagen has been referred to as "Bonnie Hagen-Sullivan," "Bonnie Hagan-Sullivan," and "Bonnie Sullivan." We refer to her as "Bonnie Hagen," which is the spelling indicated in the transcript from Gibbs's third criminal trial. (App. at 409.)

[3] Although Gibbs was charged with two counts of conspiracy to commit murder, the trial court determined that the count implicating Wayne Burke should be reduced to conspiracy to commit aggravated assault because it "is a lesser included offense of conspiracy to commit homicide." (App. at 129.)

4

In the present case, the Commonwealth's evidence was sufficient to establish the existence of two different conspiracies, one to murder Mr. Burke and the other to harm Mr. Mehl if it became necessary to shoot Mr. Burke. The objective of the first conspiracy was Mr. Burke's murder. This conspiracy started in February 1984 and continued until the evening of the actual shooting, March 27, 1984. Over the two months preceding the shooting, when only Mr. Burke's murder was being planned, discussions occurred among Sharon Burke, Bonnie Hagan-Sullivan, Hagan-Sullivan's then boyfriend, Gary Huth, and her friends, Connie Stein and Jennie Dean. The active participants in this conspiracy were Sharon Burke, Hagan-Sullivan, and Dean. Conversations with Appellant concerning the planning and execution of Mr. Burke's murder occurred on the telephone, at Sharon Burke's home, and at a business establishment. There was an overt act in furtherance of this conspiracy when Appellant conducted target practice at the Burke residence the day before the shooting.

The second conspiracy had a completely different motive and objective, to harm Mr. Mehl. That conspiracy was not formed until March 27, 1984, long after the agreement to kill Mr. Burke was in place and only when it became apparent that Mr. Mehl was going to be present with Mr. Burke at work. The discussions over what to do about Mr. Mehl occurred only between Sharon Burke and Appellant and were conducted at the Burke home and in the car on the way to Hemlock Farms.

Thus, the conspiracies involved: 1) different victims, Mr. Burke and Mr. Mehl; 2) different objectives, to kill Mr. Burke and to harm Mr. Mehl; 3) different co-conspirators; 4) different time frames; and 5) different locations for the agreements. Thus, the evidence, viewed in the light most favorable to the Commonwealth was sufficient to sustain Appellant's conviction of two counts of conspiracy.[4]

---

[4] As explained later, although the reference to target practice by Gibbs and conversations with Gibbs at a business establishment lack support in the trial record, this error does not change our conclusion.

(App. at 154–55).  On December 18, 2007, Gibbs's petition for allowance of appeal to the Supreme Court of Pennsylvania was denied.  *Commonwealth v. Gibbs*, 939 A.2d 889 (Pa. 2007) (table).

On March 12, 2008, Gibbs filed a petition for habeas relief under 28 U.S.C. § 2254(b)(1), claiming, among other things, that the two conspiracy convictions were unsupported by the record and that the Superior Court's decision to the contrary was an unreasonable application of federal law.  On October 25, 2013, the District Court issued a Memorandum and Order denying Gibbs's habeas petition.  *Gibbs v. Shannon*, Civil No. 3:CV-08-0462, 2013 WL 5781107 (M.D. Pa. Oct. 25, 2013).  In rejecting Gibbs's challenge to the multiple conspiracy convictions, the District Court held that the Superior Court's decision

> was objectively reasonable as illustrated by the evidence existing in the record and cited to by the state court that supported the existence of two separate conspiracies— including different objectives, different parties, different locations and different times.  For these reasons, the court finds that the state court determination was not contrary to, or an unreasonable application of, clearly established Federal law, and also was not based on an unreasonable determination of the facts in light of the evidence presented.  Consequently, there is no basis to grant federal habeas relief to Petitioner on this claim.

*Id.* at *18.  Gibbs then filed a petition seeking a certificate of appealability with this Court.  On April 29, 2014, we granted a certificate of appealability on the challenge to the conspiracy convictions.[5]

---

[5] Gibbs has urged that we reconsider our denial of his request for a certificate of appealability on another issue: whether his Fifth Amendment privilege against self-

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 2241(a) and 2254(a). We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). Where, as here, a state court has decided the merits of a petitioner's habeas claim, habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is appropriate only if the state court's adjudication of the claim "was (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Grant v. Lockett*, 709 F.3d 224, 231 (3d Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

## III.

Gibbs presents two central arguments on appeal: (1) that the Superior Court made unreasonable findings of fact in light of the evidence presented at trial concerning his involvement in the conspiracy to murder Wayne Burke; and (2) that the record evidence is insufficient to sustain a separate conspiracy conviction to kill or harm Mehl. We consider each contention in turn.

---

incrimination was violated by the government's introduction in its case-in-chief of statements Gibbs made to a defense psychiatrist expert even though Gibbs did not present a mental capacity defense. We remain convinced that reasonable jurists would not debate the District Court's rejection of this claim. In this regard, our holding in *United States v. Alvarez*, 519 F.2d 1036 (3d Cir. 1975), is dispositive. In that case, we concluded that "the privilege against self-incrimination is not relevant" when a defendant voluntarily agrees to undergo a psychological examination. *Id.* at 1045. Gibbs does not point to any Supreme Court precedent that contradicts this holding. Accordingly, we again decline to expand the certificate of appealability.

7

**A. The Superior Court's Factual Determinations**

We address Gibbs's factual challenge first, as it will frame our review of the Superior Court's sufficiency-of-the-evidence determination. In considering this argument, we accord great deference to the Superior Court's findings of fact. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, where a habeas petitioner challenges the factual basis for a state court's decision, we may grant relief only if it was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting 28 U.S.C. § 2254(d)(2)).

Gibbs argues that the Superior Court made an unreasonable finding of fact in asserting that "[t]here was an overt act in furtherance of this conspiracy when [Gibbs] conducted target practice at the Burke residence the day before the shooting," March 26, 1984. (App. at 155.) The Commonwealth does not point to any evidence in the record to substantiate this finding, and our review of the record reveals nothing to support this assertion. Instead, the testimony of Hagen and Betsy Burke categorically establishes that Gibbs did not become involved in the plot to murder Wayne Burke until March 27, 1984. Furthermore, Hagen testified that her friend, Dean, conducted target practice at the Burke residence on March 27. We thus conclude that the Superior Court's factual determination in this regard is without record support and constitutes an unreasonable finding of fact. *See Batchelor v. Cain*, 682 F.3d 400, 413 (5th Cir. 2012) (state court factual findings are unreasonable when "[t]he state advances no other factual basis" to support the findings

8

and the court's "review of the record reveals none"). Therefore, we do not consider this factual determination when evaluating Gibbs's remaining argument.

Our determination that the Superior Court made an unreasonable factual finding, however, is not dispositive. As we explained in *Lambert v. Blackwell*, 387 F.3d 210, 235–36 (3d Cir. 2004), "what factual findings remain to support the state court decision must still be weighed under the overarching standard of [§] 2254(d)(2)."

### B. The Conspiracy Convictions

Gibbs contends that the record is insufficient to support the jury's finding that there were two separate conspiracies, one to murder or harm Mehl and the other to murder or harm Burke.[6] Gibbs maintains that the Superior Court's decision to the contrary violated his due process rights under *In re Winship*, 397 U.S. 358, 363–64 (1970), and *Jackson v. Virginia*, 443 U.S. 307, 321 (1979). In considering the Superior Court's decision, we are bound by AEDPA's "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997), which "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) (per curiam). "This distinction creates 'a substantially higher threshold' for obtaining relief than *de novo* review." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). We defer to the state court's determination "so long as 'fairminded jurists could disagree' on the correctness of

---

[6] Gibbs concedes there was sufficient evidence to convict him of conspiracy to murder Wayne Burke, which was later reduced to conspiracy to commit aggravated assault. (Appellant's Br. at 34.) The practical impact of the convictions on separate conspiracy counts was to increase his minimum prison term by five years and his maximum term by ten years.

[that] decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Rather, that application must be 'objectively unreasonable.'" *Renico*, 559 U.S. at 773 (quoting *Williams v. Taylor*, 529 U.S. 362, 409–11 (2000)) (citations omitted).

Gibbs asserts that "all of the evidence presented by the Commonwealth at [his] third trial unequivocally indicates that there was but one conspiracy, the objective of which was to murder Wayne Burke." (Appellant's Br. at 34.) Gibbs points out that under Pennsylvania law, "[i]f a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." 18 Pa. Cons. Stat. § 903(c). We have previously noted that § 903(c) requires the Commonwealth to prove "beyond a reasonable doubt that [the defendant] entered into *two* agreements or *two* conspiratorial relationships, one to kill [the first victim] and another to kill [or harm another victim]." *Robertson v. Klem*, 580 F.3d 159, 165 (3d Cir. 2009) (emphasis in original).

In *Robertson*, we held that the evidence adduced at the petitioner's state-court trial was insufficient to support two conspiracy convictions stemming from a simultaneous double murder, despite the Superior Court's determination otherwise. *Id.* at 165. In that case, the defendants acted in concert, used a single weapon, and murdered both victims at the same time and in the same location. *Id.* at 161–62. Our review of the record revealed that "the Commonwealth simply failed to introduce *any direct or circumstantial evidence*

to suggest that the murders were the result of multiple conspiracies." *Id*. at 166 (emphasis added). Because the record was *wholly silent* as to any separate agreement— i.e., there was simply no evidence to support an inference that there were two separate agreements—we concluded that habeas relief was warranted. *Id*. at 167.

In *Robertson*, however, "[t]he only reason given by the Superior Court to support its conclusion that the evidence was sufficient to establish two conspiracies was that there were two victims." *Id.*at 166. Here, the Superior Court held that the existence of two victims was only part of the evidence supporting the two conspiracy convictions. More specifically, the testimony presented during Gibbs's third trial established that each of the conspirators—Sharon Burke, Hagen, Dean, Betsy Burke, and Gibbs—explicitly or implicitly demonstrated their agreement to murder Wayne Burke prior to Sharon Burke mentioning Mehl. As to the second conspiracy, only Sharon Burke and Gibbs agreed to harm or kill Mehl. The Superior Court also noted that the conspiracies developed over distinct timelines and were formed at separate times.

Testimony from Hagen and Betsy Burke bears out these distinctions. Hagen testified that, starting in February and continuing into late March of 1984, Sharon Burke was the mastermind of the plot to murder Wayne Burke, bringing each of the other conspirators into the fold. After Sharon Burke convinced Hagen to join her efforts sometime in March of 1984, Hagen helped recruit several potential shooters, including her boyfriend at the time, Gary Huth. Hagen explained that Sharon Burke specifically asked Huth "if [he] would kill my husband." (App. at 419.)

11

On March 26, 1984, at Sharon Burke's insistence, Hagen agreed to find a different shooter after Huth refused to participate. Hagen stated that Sharon Burke told her to ask her friends "[i]f they would kill my stepfather," Wayne Burke. (App. at 420.) That same evening, March 26, Betsy Burke first became aware of the developing plot to murder Wayne Burke. Betsy Burke testified that Sharon Burke told her that "they were planning on killing my father for the insurance money." (App. at 798.)

On March 27, acting on Sharon Burke's instructions, Hagen successfully convinced her friend, Dean, to join the plot. Dean initially agreed to be the shooter, going so far as to conduct target practice at the Burke residence on the night of the murder. However, Dean did not feel comfortable when firing the gun, so she suggested they contact Gibbs. That same night, with Sharon Burke and Hagen listening in on the call, Dean convinced Gibbs to join the conspiracy. Hagen testified that during this call, Dean told Gibbs that the plan was to kill "Bonnie Hagen's stepfather." (App. at 428.)

At around 9 p.m. on March 27, Gibbs was picked up and brought to the Burke residence. Once there, either Sharon Burke or Hagen provided Gibbs with dark clothing to wear while he carried out the crime, along with a blue bandana to cover his face. Sharon Burke also gave him a loaded gun. As Sharon Burke drew out a map of the housing development's security office, Hagen recalled that Betsy Burke showed Gibbs a picture of Wayne Burke "so that [Gibbs] knew what [he] looked like." (App. at 436.)

On the other hand, the conspiracy to kill Mehl did not form until the evening of March 27, 1984 at around 9:30 p.m., when Sharon Burke told Gibbs that Mehl would be working alongside Wayne Burke. After Sharon Burke informed Gibbs that he may have

12

to harm or kill Mehl to get to Wayne Burke, the record is notably devoid of any evidence tending to show that the other conspirators agreed with or provided aid to this facet of the plan. Taken as a whole and viewed in the light most favorable to the Commonwealth, the evidence supports the Superior Court's conclusion that there was two conspiracies, having different conspirators, separate timelines, distinct agreements, and different victims.

*Robertson* does not compel us to reach a different conclusion. There, we principally based our holding on the Commonwealth's failure to offer any "evidence to suggest that [the conspirators] reached separate agreements related to each murder." 580 F.3d at 166. As discussed above, the evidence of two separate agreements—one to kill Wayne Burke, and one to harm or kill Mehl—formed at separate times between different conspirators distinguishes this case from *Robertson*. In light of AEDPA's highly deferential standard, we cannot conclude that the Superior Court's decision was based upon an unreasonable finding of fact or reflected an unreasonable application of clearly established federal law. Gibbs has failed to meet his high burden and, thus, the District Court properly denied habeas relief.

IV.

For the foregoing reasons, we will affirm the District Court's order denying Gibbs's petition for habeas relief.

13

Barry Gibbs v. Robert Shannon
No. 13-4402

_____

AMBRO, Circuit Judge, concurring in part and dissenting in part

I would grant Mr. Gibbs *habeas* relief on his double-jeopardy claim. Even viewing the record in the light most favorable to the Commonwealth and affording its state-court decisions the deference owed under 28 U.S.C. § 2254(e), I believe no reasonable juror could conclude that the Commonwealth sustained its burden of proving two separate conspiracies beyond a reasonable doubt. I thus partially dissent.[1]

A person who conspires "to commit a number of crimes . . . is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." 18 Pa. Cons. Stat. Ann. § 903(c). Because conspiracies often involve a number of subagreements, distinguishing between a single conspiracy and multiple conspiracies can be a challenging task. The key is to determine whether there is "but one scheme, one enterprise, one conspiratorial web." *United States v. McBrown*, 149 F.3d 1176 (5th Cir. 1998) (quoting *United States v. Rodriguez*, 585 F.2d 1234, 1249 (5th Cir. 1978), *on reh'g*, 612 F.2d 906 (5th Cir. 1980), *aff'd sub nom. Albernaz v. United States*, 450 U.S. 333 (1981)). If a court erroneously treats "each stitch in that web . . . as a separate conspiracy, infinite bases for liability could be confected." *Rodriguez*, 585 F.2d at 1250.

_____

[1] For the reasons stated by my colleagues, I agree Gibbs is not entitled to a Certificate of Appealability on the issue of whether admission of the psychiatric testimony violated his Fifth Amendment rights.

Pennsylvania courts consider the totality of the circumstances to aid in this endeavor. *Commonwealth v. Barnes*, 871 A.2d 812, 820 (Pa. Super. Ct. 2005), *aff'd*, 924 A.2d 1202 (Pa. 2007). Although the precise test is flexible, the seven factors most commonly considered are: "[t]he number of overt acts in common"; "the locations in which the alleged acts took place"; "the time period during which the alleged acts took place"; "the extent to which the purported conspiracies share a common objective"; "the degree to which interdependence is needed for the overall operation to succeed"; "the similarity in methods of operation"; and "the overlap of personnel." *Commonwealth v. Andrews*, 768 A.2d 309, 316 (Pa. 2001) (quoting *Commonwealth v. Koehler*, 737 A.2d 225, 245 (Pa. 1999)). Application of these factors to the facts of this case leads me to conclude the two supposedly separate conspiracies were but one.

*(1)     Common Overt Acts:* As my colleagues concede, the Superior Court started off on the wrong foot by finding, without any support in the record, that Gibbs engaged in the act of target practice the day before the shooting to further the Wayne Burke (but not the Mehl) conspiracy. No target practice by Gibbs ever occurred; it was Jennifer Dean who practiced shooting the gun, and that happened the *day of* the shooting. The acts of the two conspiracies were precisely the same, including Gibbs changing into less conspicuous clothes, Sharon Burke providing a gun and driving to Hemlock Farms, and Gibbs firing shots that killed Mehl but were aimed at Wayne Burke.

*(2)     Locations of the Overt Acts:* Equally devoid of record support is the state court's finding that "[c]onversations with [Gibbs] concerning the planning and execution of Mr. Burke's murder occurred on the telephone, at Sharon Burke's home, and at a

2

business establishment," while "[t]he discussions over what to do about Mr. Mehl . . . were conducted at the Burke home and in the car on the way to Hemlock farms." In fact, Gibbs never spoke of Wayne Burke's murder "at a business establishment," and Gibbs also discussed killing Burke in transit to Hemlock Farms together with the conversation concerning Mehl. The conspiracies thus overlapped in their geographic scopes.

(3) *Time Period of the Overt Acts*: Not only did the overt acts occur at identical locations, they took place at identical times. My colleagues conclude this factor weighs in the opposite direction by focusing on the point in time the different agreements were formed. But the relevant inquiry is not "the precise time at which each objective [of a single continuing conspiracy] was conceived." *Andrews*, 768 A.2d at 316 (quoting Model Penal Code § 5.03 explanatory note)). Rather, it is the sequence and span of the overt acts and whether "the second object was agreed to before attainment of the first." *Developments in the Law—Conspiracy*, 72 Harv. L. Rev. 920, 930 (1959); *see also United States v. Rigas*, 605 F.3d 194, 213 (3d Cir. 2010). Here, because the overt acts occurred in a continuous, uninterrupted sequence and because the timeframe of the Mehl conspiracy was subsumed within that pertaining to the attempted murder of Wayne Burke, this factor augurs in favor of Gibbs.

(4) *Presence of Common Objective*: I also disagree with the majority that the conspiracies were not united by a single overarching purpose: to murder Wayne Burke. In identifying the goal of harming or killing Mehl as a second, independent objective, the majority fails to recognize that the assault or attempted murder of Mehl was never the group's ultimate goal. *See, e.g.*, *Commonwealth v. Lore*, 487 A.2d 841, 855 (Pa. Super.

3

Ct. 1984) (concluding there was only a single conspiracy where the coconspirators agreed to commit separate criminal acts all aimed at the ultimate goal of avoiding detection for murder). As Bonnie Hagan Sullivan testified at trial, Sharon Burke instructed Gibbs that "'if you have to injure [Mehl] to get through Wayne [Burke] injure him,' but . . . 'don't just shoot him and then shoot Wayne, try not to kill him.' . . . Then, at some point, [Sharon said] 'well, if you have to go through [Mehl] to get to Wayne, then go through him to get to Wayne.'" Bottom line: the *overall* goal remained the same.

*(5)* *Interdependence of the Schemes*: Closely related to whether there was one overarching goal is the degree of interdependence between the schemes. This element weighs in favor of a single conspiracy where the evidence indicates that one aspect of the scheme is "necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (quoting *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)). As the trial judge aptly noted, the purported agreement to kill Mehl was a "contingent conspiracy"—the coconspirators saw no point to injuring or killing him save for facilitating Wayne Burke's murder. Thus, despite my colleagues' and the state court's failure to consider this factor, it also supports a single conspiracy.

*(6)* *Similarity of the Methods of Operation*: Analysis of the sixth relevant factor is likewise nowhere to be found in my colleagues' and the state court's opinions, though the methods of operation were identical. Gibbs purportedly aimed the gun barrel at both men at precisely the same time and did nothing to further the murder of Mehl that he had not already done to further his attempted murder of Burke.

4

*(7)* *Overlap in Personnel*: Finally, it seems clear to me that the same group of individuals were involved in both parts of the scheme, as not one of the four women (Sharon Burke, Jennifer Dean, Bonnie Hagan Sullivan, and Betsy Burke) left Gibbs's side the night of the murder as preparations took place in the Burke trailer and during the drive to Hemlock Farms. In concluding that "the record is notably devoid of any evidence tending to show that" anyone other than Gibbs and Sharon Burke "agreed with or provided aid to th[e] facet of the plan" concerning Mehl, my colleagues overlook that an agreement to partake in criminal activity "need not be formal by express words"—it "may be inferred from concerted action." *Commonwealth v. DiEmidio*, 182 A.2d 537, 540 (Pa. Super. Ct. 1962), *rev'd on other grounds*, 188 A.2d 750 (Pa. 1963). Thus, that Jennifer, Bonnie, and Betsy "stood by silently" while Mehl was discussed is sufficient evidence to conclude they "acquiesce[d] in th[e] *enlarged* criminal enterprise." *State v. Crosswell*, 612 A.2d 1174, 1181 (Conn. 1992) (emphasis added).

In addition to all seven factors weighing in Gibbs favor, I cannot ignore that the Commonwealth has made its own bed. Both in its opening and closing arguments at trial, it argued that *all* the charged activities, including the murder of Mehl, were part of a single, ongoing plan to kill Wayne Burke. Moreover, the Commonwealth's position on appeal that Jennifer Dean, Bonnie Hagan Sullivan, and Betsy Burke did not participate in Mehl's murder is curious given that all three pled guilty for their role in that crime (just as they did for their role in the attempted murder of Wayne Burke). Though I don't mean to suggest that tack was improper, prosecutors cannot urge "courts [to] take a broad view of conspiracy" at trial to secure convictions yet advocate for "a narrow view in reviewing

5

a . . . double jeopardy claim." *United States v. Ashland-Warren, Inc.*, 537 F. Supp. 433, 449 (M.D. Tenn. 1982). The easy manipulation of the conspiracy doctrine may make it the "darling of the modern prosecutor's nursery," *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925) (Hand, J.), but there must be limits to allowing "substantive law [to be used as] an empty container whose content [the prosecution] may regulate at its pleasure," *Ashland-Warren*, 537 F. Supp. at 449.

Despite my belief that Gibbs's conspiracy convictions violate the Double Jeopardy Clause, I would reject his invitation to grant him a new trial for that violation. Where, as here, the multiple conspiracy "counts are not inconsistent, but instead overlapping," retrial is not the appropriate remedy. *United States v. Mori*, 444 F.2d 240, 246 (5th Cir. 1971). However, to the extent the Commonwealth argues the constitutional violation may be remedied simply by re-imposing a general sentence without vacating one of the conspiracy convictions, that approach would also be incorrect. *United States v. Ward*, 626 F.3d 179, 185 n.8 (3d Cir. 2010). The proper remedy is for the state court to vacate one of the conspiracy convictions and resentence him on the remaining counts.

Because I part ways with my colleagues on Mr. Gibbs's double-jeopardy claim, I respectfully dissent in part.